Approved: _____
SAGAR K. RAVI
Assistant United States Attorney

Before:   THE HONORABLE KEVIN NATHANIEL FOX          20 MAG 5202
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - -X
                                    :     **<u>SEALED COMPLAINT</u>**
UNITED STATES OF AMERICA            :
                                    :     Violations of
     - v. -                         :     15 U.S.C. § 645(a)
                                    :     and 18 §§ 1001,
                                    :     1014, 1031, 1343,
MUGE MA,                            :     and 1344
     a/k/a "Hummer Mars,"           :
                                    :     COUNTY OF OFFENSE:
          Defendant.                :     NEW YORK
                                    :
- - - - - - - - - - - - - - - - - -X

SOUTHERN DISTRICT OF NEW YORK, ss.:

     WILLIAM R. MCKEEN, being duly sworn, deposes and says that
he is a Special Agent with the Federal Bureau of Investigation
("FBI"), and charges as follows:

<u>**COUNT ONE**</u>
**(Major Fraud Against the United States)**

     1.   From at least in or about March 2020 through at least
on or about May 15, 2020, in the Southern District of New York
and elsewhere, MUGE MA, a/k/a "Hummer Mars," the defendant,
willfully and knowingly executed, and attempted to execute, a
scheme and artifice with the intent to defraud the United
States, and to obtain money and property by means of false and
fraudulent pretenses, representations, and promises, in a grant,
contract, subcontract, subsidy, loan, guarantee, insurance, and
other form of Federal assistance, including through an economic
stimulus, recovery and rescue plan provided by the Government,
the value of which was $1,000,000 and more, to wit, MA engaged
in a scheme to obtain over $20 million in Government-guaranteed
loans by means of false and fraudulent pretenses,
representations, and documents for New York International
Capital LLC ("NYIC") and Hurley Human Resources LLC ("Hurley"),
two companies owned and controlled by MA (collectively, the "Ma
Companies"), through two loan programs of the United States

Small Business Administration (the "SBA") designed to provide relief to small businesses during the novel coronavirus/COVID-19 pandemic, namely the Paycheck Protection Program (the "PPP") and the Economic Injury Disaster Loan ("EIDL") Program.

(Title 18, United States Code, Sections 1031 and 2.)

## COUNT TWO
### (Bank Fraud)

2.   From at least in or about March 2020 through at least on or about May 15, 2020, in the Southern District of New York and elsewhere, MUGE MA, a/k/a "Hummer Mars," the defendant, willfully and knowingly executed, and attempted to execute, a scheme and artifice to defraud financial institutions, the deposits of which were insured by the Federal Deposit Insurance Corporation ("FDIC"), and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institutions, by means of false and fraudulent pretenses, representations and promises, to wit, MA engaged in a scheme to obtain over $20 million in Government-guaranteed loans for the Ma Companies from FDIC-insured banks through the PPP by means of false and fraudulent pretenses, representations, and documents.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT THREE
### (Wire Fraud)

3.   From at least in or about March 2020 through at least on or about May 15, 2020, in the Southern District of New York and elsewhere, MUGE MA, a/k/a "Hummer Mars," the defendant, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, knowingly transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, MA engaged in a scheme to obtain over $20 million in Government-guaranteed loans for the Ma Companies from the SBA and financial institutions through the PPP and the EIDL Program by means of false and fraudulent pretenses, representations, and documents, including

emails transmitted into and out of the Southern District of New York.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT FOUR
### (Making False Statements to a Bank)

4.    From at least in or about March 2020 through at least on or about May 15, 2020, in the Southern District of New York and elsewhere, MUGE MA, a/k/a "Hummer Mars," the defendant, knowingly made false statements and reports and willfully overvalued land, property, and security, for the purpose of influencing the actions of financial institutions, the accounts of which were insured by the FDIC, in connection with an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, and loan, to wit, MA made false statements to FDIC-insured banks regarding, among other things, the number of employees of the Ma Companies and the wages paid to employees of the Ma Companies, for the purpose of obtaining over $20 million in Government-guaranteed loans for the Ma Companies through the PPP.

(Title 18, United States Code, Sections 1014 and 2.)

## COUNT FIVE
### (Making False Statements)

5.    From at least in or about March 2020 through at least on or about May 15, 2020, in the Southern District of New York and elsewhere, MUGE MA, a/k/a "Hummer Mars," the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation and made and used a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, to wit, MA made false statements to the SBA regarding, among other things, the number of employees of the Ma Companies, for the purpose of obtaining a total of approximately $650,000 for the Ma Companies through the EIDL Program administered by the SBA.

(Title 18, United States Code, Sections 1001 and 2.)

## COUNT SIX
### (Making False Statements to the SBA)

6.   From at least in or about March 2020 through at least
on or about May 15, 2020, in the Southern District of New York
and elsewhere, MUGE MA, a/k/a "Hummer Mars," the defendant,
knowingly and willfully made a false statement for the purpose
of obtaining a loan for an applicant, influencing in any way the
action of the SBA, and obtaining money, property, or anything of
value, under Chapter 14 of Title 15 of the United States Code,
to wit, MA made false statements to the SBA regarding, among
other things, the number of employees of the Ma Companies, for
the purpose of obtaining a total of approximately $650,000 for
the Ma Companies through the EIDL Program administered by the
SBA.

(Title 15, United States Code, Sections 645(a), and Title 18,
United States Code, Section 2.)

The bases for my knowledge and for the foregoing charges
are, in part, as follows:

7.   I am a Special Agent with the FBI and I have been
personally involved in the investigation of this matter.  This
affidavit is based upon my personal participation in the
investigation of this matter, my conversations with law
enforcement agents, witnesses, and others, as well as my
examination of report and records.  Because this affidavit is
being submitted for the limited purpose of establishing probable
cause, it does not include all the facts that I have learned
during the course of my investigation.  Where the contents of
documents and the actions, statements, and conversations of
others are reported herein, they are reported in substance and
in part, except where otherwise indicated.  Where figures,
calculations, and dates are set forth herein, they are
approximate, unless stated otherwise.

### Overview of the Fraudulent Conduct

8.   MUGE MA, a/k/a "Hummer Mars," the defendant, is a
Chinese national presently residing in Manhattan, New York with
lawful permanent resident status in the United States.
According to his publicly available LinkedIn profile, MA earned
a Master of Business Administration in or about 2013, and has
been the Executive Director of NYIC since in or about June 2016,
and the Executive Director of Hurley since in or about January
2019.  Based on their websites described herein, the Ma

4

Companies are purportedly "global" companies with hundreds of employees.

9.    From at least in or about March 2020 through at least on or about May 15, 2020, MUGE MA, a/k/a "Hummer Mars," the defendant, applied to the SBA and at least five banks for a total of over $20 million in government-guaranteed loans for the Ma Companies through the SBA's PPP and EIDL Program.  In connection with these loan applications, MA represented, among other things, that he was the sole owner and executive director of the Ma Companies, that the Ma Companies were located on the sixth floor of a luxury condominium building in Manhattan, New York (the "Condo Building"), and that NYIC and Hurley together had hundreds of employees and paid millions of dollars in wages to those employees on a monthly basis.  In fact, however, as described below, MA appears to have been the only employee of NYIC since at least in or about 2019, and Hurley does not appear to have any employees.  In order to support the false representations made by MA in the loan applications about the number of employees at and the wages paid by the Ma Companies, MA submitted fraudulent and doctored bank records, tax records, insurance records, payroll records, and/or audited financial statements to at least five banks.

10.   Before the discovery of the fraudulent conduct by MUGE MA, a/k/a "Hummer Mars," the defendant, the SBA approved a $500,000 EIDL Program loan for NYIC and a $150,000 EIDL Program loan for Hurley, and a $10,000 loan advance was provided to NYIC.  In addition, a bank approved and disbursed over approximately $800,000 in PPP loan funds for Hurley, which were frozen in connection this investigation.  As a result, MA sought to withdraw his loan applications from the financial institutions and return the funds.

11.   Finally, MUGE MA, a/k/a "Hummer Mars," the defendant, and individuals purporting to work for NYIC, have fraudulently represented to a COVID-19 test kit manufacturer and a medical equipment supplier that NYIC is representing the New York State Government and the Governor of New York in procuring COVID-19 test kits and personal protective equipment to respond to the COVID-19 pandemic.  NYIC is not, however, an authorized vendor of New York State, nor has NYIC been authorized to represent New York State in connection with the procurement of COVID-19 supplies.

<u>Background on SBA Lending in Response to COVID-19</u>

12.   The SBA is a federal agency of the Executive Branch
that administers assistance to American small businesses.  This
assistance includes guaranteeing loans that are issued by
certain lenders to qualifying small businesses.  Under the SBA
loan guarantee programs, the actual loan is issued by a
commercial lender, but the lender receives the full faith and
credit backing of the United States Federal Government on a
percentage of the loan.  Therefore, if a borrower defaults on an
SBA-guaranteed loan, the commercial lender may seek
reimbursement from the SBA, up to the percentage of the
guarantee.  By reducing the risk to commercial lenders, the SBA
loan guarantee programs enable lenders to provide loans to
qualifying small businesses when financing is otherwise
unavailable to them on reasonable terms through normal lending
channels.  When a borrower seeks an SBA-guaranteed loan, the
borrower must meet both the commercial lender's eligibility
requirements for the loan as well as the SBA's eligibility
requirements.

13.   The Coronavirus Aid, Relief, and Economic Security
("CARES") Act is a federal law enacted on March 29, 2020
designed to provide emergency financial assistance to the
millions of Americans who are suffering the economic effects
caused by the COVID-19 pandemic.  One source of relief provided
by the CARES Act was the authorization of up to $349 billion in
forgivable loans to small businesses for job retention and
certain other expenses through the PPP.  On April 24, 2020, the
Paycheck Protection Program and Health Care Enhancement Act was
signed into law, authorizing over $300 billion in additional PPP
funding.

14.   The PPP allows qualifying small businesses and other
organizations to receive unsecured SBA-guaranteed loans with a
maturity of two years and interest rate of one percent.  PPP
loan proceeds must be used by businesses on payroll costs,
mortgage interest, rent, and/or utilities.  The PPP allows the
interest and principal to be forgiven if businesses spend the
proceeds on these expenses within eight weeks of receipt and use
at least 75% of the forgiven amount for payroll.  Pursuant to
the CARES Act, the amount of PPP funds a business is eligible to
receive is determined by the number of employees employed by the
business and their average payroll costs.  Businesses applying
for a PPP loan must provide documentation to confirm that they
have in the past paid employees the compensation represented in
the loan application.  The PPP is overseen by the SBA, which has

authority over all PPP loans, but individual PPP loans are issued by approved commercial lenders who receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds.

15.   The CARES Act also expanded the separate EIDL Program, which provides small businesses with low-interest loans of up to $2 million that can provide vital economic support to help overcome the temporary loss of revenue they are experiencing due to COVID-19.  To qualify for an EIDL under the CARES Act, the applicant must have suffered "substantial economic injury" from COVID-19, based on a company's actual economic injury determined by the SBA, up to $2 million.  EIDLs may be used for payroll and other costs as well as to cover increased costs due to supply chain interruption, to pay obligations that cannot be met due to revenue loss, and for other similar uses.  The CARES Act also permits applicants to request an advance of up to $10,000 to pay allowable working capital needs, which is expected to be paid by the SBA within three days of submission of an EIDL application to the SBA, provided the application contains a self-certification under penalty of perjury of the applicant's eligibility for an EIDL.  Unlike the PPP, the SBA directly makes loans to applicants under the EIDL Program.

<u>The Ma Companies</u>

16.   Based on my review of publicly available information from the website of the Delaware Department of State, Division of Corporations, as well as records provided by MUGE MA, a/k/a "Hummer Mars," the defendant, to the SBA and financial institutions, I have learned the following, in substance and in part:

        a.   NYIC is a Delaware limited liability company that was formed on or about June 20, 2016 with MA as the sole member.

        b.   Hurley is a Delaware limited liability company that was formed on or about January 28, 2019 with MA as the sole member.

17.   Based on my review of the website for NYIC accessible via https://www.nyinternationalcapital.com as of on or about May 16, 2020 (the "NYIC Website"), I have learned the following, in substance and in part:

        a.   The homepage of the NYIC Website describes NYIC as follows:

NYIC is a patriotic American CLOUD-based Management Consulting firm headquartered in Manhattan, New York City. NYIC has the unique ability to deploy HUNDREDS of brilliant, hard-working & passionate young professionals ALL dedicated to YOUR project connecting you with 10,000+ CHIEF EXECUTIVES of the world's 10,000+ BLUE-CHIPs as your strategic partners in the speed of light.

b.   A section of the NYIC Website titled "THE ONE THE ONLY" states the following:

Coordinated by the Manhattan New York City headquarters, NYIC's MULTIPLE TEAMS spread over the entire country work SEAMLESSLY connecting YOU with the world's BLUE-CHIPs and make them as your strategic partners. The work can be DONE ONLY WITHIN WEEKs, soliciting MULTIPLE OFFERs, having them COMPETE EACH OTHER HEAD TO HEAD in front of YOU for you to engage the one with THE BEST FIT.

c.   The NYIC Website displays numerous purported photos of MUGE MA, a/k/a "Hummer Mars," the defendant, and other purported employees of NYIC meeting with government and business leaders around the world, including the New York State Governor, a former New York City Mayor, and chief executives of major corporations.

d.   The "NYIC GLOBAL HEADQUARTERS" is purportedly located on the sixth floor of the Condo Building.

18.   Based on my review of the website for Hurley accessible via https://www.hurleyhumanresources.com as of on or about May 16, 2020 (the "Hurley Website"), I have learned the following, in substance and in part:

a.   A section of the Hurley Website titled "ABOUT" states the following: "HURLEY HR is a global human resources consulting firm with its global headquarters in Manhattan, New York City."

b.   A section of the Hurley Website titled "CORE EXPERTISE" states the following: "HURLEY HR's core expertise include Mergers & Acquisitions, Debt Financing, Growth Equity,

Joint Venture/Partnering, Valuations/Fairness Opinion, and
Strategic Advisory human resources management.  HURLEY HR offers
products and services on a global scale."

      c.   A section of the Hurley Website titled "Global
Capabilities" contains photos depicting and listing the
following cities around the world:  New York City, London, Hong
Kong, Frankfurt, Shanghai, Paris, Beijing, São Paulo, Tokyo, Los
Angeles, Shen Zhen, San Francisco, and Hang Zhou.

      d.   The "HURLEY HR GLOBAL HEADQUARTERS" is
purportedly located at 85F One World Trade Center in Manhattan,
New York.

### The EIDL Applications to the SBA for NYIC and Hurley

19.   Based on my review of records obtained from the SBA, I
have learned the following, in substance and in part, regarding
an EIDL application for NYIC submitted by MUGE MA, a/k/a "Hummer
Mars," the defendant:

      a.   On or about March 30, 2020, MA applied to the SBA
for an EIDL for NYIC.

      b.   The EIDL application for NYIC represented, in
substance and in part, that NYIC opened for business on or about
June 19, 2016, had 197 employees, and had gross revenues of $2.9
million for the 12 months prior to the COVID-19 disaster.  The
application also represented that MA was the sole owner of NYIC
and a U.S. citizen.  The address listed in the application for
both NYIC and MA was the Condo Building.

      c.   In email correspondence with the SBA, MA used the
name "Hummer Mars."  When the SBA inquired about his legal name,
MA wrote the following, in substance and in part:  "Hummer Mars
is my American name I have been proudly using everywhere since I
permanently moved to the United States a decade ago.  MUGE MA is
my original name and legal name at this moment."  MA also
included a link to the NYIC Website in his email correspondence
with the SBA.

      d.   On or about April 15, 2020, an EIDL advance of
$10,000 was deposited into NYIC's bank account, a portion of
which was spent at a consumer electronics store and a department
store.

     e.    On or about April 27, 2020, the SBA authorized a $500,000 EIDL to NYIC.  The same day, MA signed a Loan Authorization and Agreement with the SBA in which he certified, among other things, the following:  "All representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan."

    20.  Based on my review of records obtained from the SBA, I have learned the following, in substance and in part, regarding an EIDL application for Hurley submitted by MUGE MA, a/k/a "Hummer Mars," the defendant:

     a.    On or about March 30, 2020, MA applied to the SBA for an EIDL for Hurley.

     b.    The EIDL application for Hurley represented, in substance and in part, that Hurley opened for business on or about January 28, 2019, had 147 employees, and had gross revenues of $1.51 million for the 12 months prior to the COVID-19 disaster.  The application also represented that MA was the sole owner of Hurley and a U.S. citizen.  The address listed in the application for both NYIC and MA was the Condo Building, with a certain unit of the Condo Building specified for MA's residence (the "Ma Apartment").

     c.    In email correspondence with the SBA, MA provided a company profile for Hurley that listed the Hurley Website and stated the following, in substance and in part:

> HURLEY HR's mission is to help American workers and recent graduates find jobs.  The employers HURLEY HR work with include U.S.-based small and medium-sized businesses ("SMBs"), large corporations, and blue-chip companies based both in the U.S. and overseas. . . .
>
> The short-term strategic goal of HURLEY HR is preventing an irreversible disruption of its operation caused by the pandemic.  The final strategic goal of HURLEY HR is to help the country reduce the high unemployment rate caused by the pandemic by helping unemployed American workers and unemployed American fresh graduates find jobs as quickly as possible by introducing American job seekers with HURLEY

HR's U.S. and international employer connections.

d.   On or about May 13, 2020, the SBA authorized a $150,000 EIDL to Hurley, which was put on hold as a result of this investigation.

The PPP Loan Application for Hurley to Bank-1

21.   Based on my review of records obtained from a financial institution headquartered in Manhattan, New York ("Bank-1") and my conversations with representatives of Bank-1, I have learned the following, in substance and in part, regarding a PPP loan application for Hurley submitted by MUGE MA, a/k/a "Hummer Mars," the defendant:

a.   On or about April 20, 2020, MA applied to Bank-1 for a $4,859,500 PPP loan for Hurley.  The loan amount requested by MA was subsequently reduced to $813,250 in an amended PPP loan application dated May 6, 2020 (the "Bank-1 Application").

b.   The Bank-1 Application for Hurley signed by MA represented, in substance and in part, that Hurley had an average monthly payroll of approximately $325,300, had 163 employees, and that the loan funds would be used for payroll, lease/mortgage interest, and utilities.  The Bank-1 Application also represented that MA was the sole owner and executive director of Hurley and a U.S. citizen.  The address listed in the application for Hurley was the sixth floor of the Condo Building, and the address listed for MA was the Condo Building.

c.   In the Bank-1 Application, MA certified, in substance and in part, the following:

i.   MA was not the owner of any business other than Hurley;

ii.   The United States was the principal place of residence for all employees of Hurley included in the payroll calculation;

iii.   Current economic uncertainty makes the loan request necessary to support the ongoing operations of Hurley;

iv.   Hurley will provide documentation verifying the number of full-time equivalent employees on Hurley's payroll as well as the dollar amounts of payroll costs;

11

v.      The information provided in the loan application and in all supporting documents and forms is true and accurate in all material respects; and

vi.     MA understood that knowingly making a false statement to obtain a guaranteed loan from the SBA is punishable under the law.

d.   In order to support the representations regarding the number of employees and average monthly payroll for Hurley in the Bank-1 Application, MA submitted the following documents to Bank-1:

i.      A purported Internal Revenue Service ("IRS") Form 941 (Employer's Quarterly Federal Tax Return) for Hurley for the first quarter of 2019, which was signed by MA on or about March 31, 2020 and reported that Hurley had 158 employees who were paid a total of approximately $975,900 during the period.[1]

ii.     A purported IRS Form W-3 (Transmittal of Wage and Tax Statements) for Hurley, which was signed by MA on or about March 31, 2020 and reported a total number of 158 Forms W-2 filed for employees and a total of approximately $3.904 million in wages, tips, and other compensation paid in 2019.[2]

iii.    A purported IRS Form 1120 (U.S. Corporation Income Tax Return) for Hurley for 2019, which was signed by MA and reported gross revenues of approximately $6.789 million and salaries and wages paid of approximately $3.904 million.

iv.     A document purportedly issued by a payroll company (the "Payroll Company") addressed to MA stating, in substance and in part, that Hurley's payroll for the pay period

---

[1]  IRS Form 941 is used to report wages a business has paid as well as employment taxes withheld.  Form 941 is generally due by the last day of the month following the end of the quarter.  For example, a business is required to file Form 941 by April 30 for wages paid during the first quarter, which is January through March.

[2]  IRS Form W-3 provides a summary of the wages and contributions paid by a business for the previous year, and essentially totals up all of the Form W-2 data that the business submits in an overview document.

of December 16, 2019 through December 31, 2019 had been approved and submitted for processing.

        e.   MA also provided a document to Bank-1 containing a description of Hurley's business, which stated the following, in substance and in part: "About 70% of our employees are managers who manage our engaged institutional and individual clients as well as the managers' associates. The rest of our staff are our administrative executives who focus on running our company's day-to-day operation in various aspects."

        f.   On or about May 6, 2020, Bank-1 approved a $813,250 PPP loan to Hurley, which was disbursed to Hurley's account at Bank-1 on or about May 13, 2020. As a result of this investigation, however, the loan funds and other accounts held by MA at Bank-1 were frozen by Bank-1.

        g.   On or about May 14, 2020, after MA learned that Hurley's bank account and his accounts at Bank-1 had been frozen pending an investigation by Bank-1, MA informed Bank-1, in substance in part, that he wanted to return the funds.

<u>The PPP Loan Application for NYIC to Bank-2</u>

    22.   Based on my review of records obtained from a financial institution headquartered in Manhattan, New York ("Bank-2"), I have learned the following, in substance and in part, regarding a PPP loan application for NYIC submitted by MUGE MA, a/k/a "Hummer Mars," the defendant:

        a.   On or about April 24, 2020, MA applied to Bank-2 for a $6,174,658 PPP loan for NYIC (the "Bank-2 Application").

        b.   The Bank-2 Application for NYIC signed by MA represented, in substance and in part, that NYIC had an average monthly payroll of approximately $2,469,863, had 483 employees, and that the loan funds would be used for payroll and lease/mortgage interest. The Bank-2 Application also represented that MA was the sole owner and executive director of NYIC and a U.S. citizen. The address listed in the application for NYIC was the sixth floor of the Condo Building, and the address listed for MA was the Condo Building.

        c.   In the Bank-2 Application, MA certified, in substance and in part, the following:

       i.      MA was not the owner of any business other than NYIC;

       ii.     The United States was the principal place of residence for all employees of NYIC included in the payroll calculation;

       iii.    Current economic uncertainty makes the loan request necessary to support the ongoing operations of NYIC;

       iv.    NYIC will provide documentation verifying the number of full-time equivalent employees on NYIC's payroll as well as the dollar amounts of payroll costs;

       v.     The information provided in the loan application and in all supporting documents and forms is true and accurate in all material respects; and

       vi.    MA understood that knowingly making a false statement to obtain a guaranteed loan from the SBA is punishable under the law.

       d.   In order to support the representations regarding the number of employees and average monthly payroll for NYIC in the Bank-2 Application, MA submitted the following documents to Bank-2:

       i.      A purported IRS Form 941 for NYIC for the first quarter of 2019, which was signed by MA on or about March 31, 2020 and reported that NYIC had 495 employees who were paid a total of approximately $8.002 million during the period.

       ii.     A purported IRS Form 941 for NYIC for the second quarter of 2019, which was signed by MA on or about March 31, 2020 and reported that NYIC had 421 employees who were paid a total of approximately $6.817 million during the period.

       iii.    A purported IRS Form 941 for NYIC for the third quarter of 2019, which was signed by MA on or about March 31, 2020 and reported that NYIC had 440 employees who were paid a total of approximately $7.113 million during the period.

       iv.    A purported IRS Form 941 for NYIC for the fourth quarter of 2019, which was signed by MA on or about March 31, 2020 and reported that NYIC had 476 employees who were paid a total of approximately $7.706 million during the period.

> v.     A purported IRS Form W-3 for NYIC, which was signed by MA on or about March 31, 2020 and reported a total number of 458 Forms W-2 filed for employees and a total of approximately $29.638 million in wages, tips, and other compensation paid in 2019.

> vi.     A purported IRS Form 1120 for NYIC for 2019, which was signed by MA on or about March 30, 2020 and reported gross revenues of approximately $41.744 million and salaries and wages paid of approximately $29.638 million.

> vii.     A document purportedly issued by the Payroll Company addressed to NYIC stating, in substance and in part, that NYIC's payroll for the pay period of March 16, 2020 through March 31, 2020 had been approved and submitted for processing.

> viii.     Audited consolidated financial statements for 2018 and 2019 purportedly certified by a "Big Four" accounting firm (the "Accounting Firm"), which reported total revenues of approximately $41.744 million in 2019 and $30.921 million in 2018, and total assets of approximately $34.078 million in 2019 and $26.482 million in 2018.

> e.     Bank-2 ultimately denied the PPP loan application based on potential fraud.

<u>The PPP Loan Application for NYIC to Bank-3</u>

23.     Based on my review of records obtained from a financial institution headquartered in Providence, Rhode Island ("Bank-3"), I have learned the following, in substance and in part, regarding a PPP loan application for NYIC submitted by MUGE MA, a/k/a "Hummer Mars," the defendant:

> a.     On or about April 27, 2020, three days after MA submitted the Bank-2 Application, MA applied to Bank-3 for a $4,464,600 PPP loan for NYIC (the "Bank-3 Application").

> b.     The Bank-3 Application for NYIC signed by MA represented, in substance and in part, that NYIC had monthly payroll costs of approximately $1,789,861, had over 250 employees, and that the loan funds would be used for payroll and lease/mortgage interest.  The Bank-3 Application also represented that MA was the sole owner of NYIC and a U.S. citizen.  The address listed in the application for NYIC was the sixth floor of the Condo Building, and the address listed for MA was the Ma Apartment in the Condo Building.

     c.   In the Bank-3 Application, MA certified, in substance and in part, the following:

       i.   MA was not the owner of any business other than NYIC;

       ii.   The United States was the principal place of residence for all employees of NYIC included in the payroll calculation;

       iii.   Current economic uncertainty makes the loan request necessary to support the ongoing operations of NYIC;

       iv.   NYIC will provide documentation verifying the number of full-time equivalent employees on NYIC's payroll as well as the dollar amounts of payroll costs;

       v.   The information provided in the loan application and in all supporting documents and forms is true and accurate in all material respects; and

       vi.   MA understood that knowingly making a false statement to obtain a guaranteed loan from the SBA is punishable under the law.

     d.   In order to support the representations regarding the number of employees and average monthly payroll for NYIC in the Bank-3 Application, MA submitted to Bank-3 the same purported IRS Forms 941 for each quarter of 2019 and the same purported IRS Form W-3 provided to Bank-2 in connection with the Bank-2 Application.

     e.   Bank-3 ultimately denied the PPP loan application based on potential fraud.

<u>The PPP Loan Application for NYIC to Bank-4</u>

24.   Based on my review of records obtained from a financial institution headquartered in Detroit, Michigan ("Bank-4"), I have learned the following, in substance and in part, regarding a PPP loan application for NYIC submitted by MUGE MA, a/k/a "Hummer Mars," the defendant:

     a.   On or about April 28, 2020, three days after MA submitted the Bank-2 Application and one day after MA submitted

the Bank-3 Application, MA applied to Bank-4 for a $4,484,654.32 PPP loan for NYIC (the "Bank-4 Application").

      b.   The Bank-4 Application for NYIC signed by MA represented, in substance and in part, that NYIC had an average monthly payroll of approximately $1,605,410, had 313 employees, and that the loan funds would be used for payroll and lease/mortgage interest.  The application also represented that MA was the sole owner and executive director of NYIC and a U.S. citizen.  The address listed in the application for NYIC was the sixth floor of the Condo Building, and the address listed for MA was the Ma Apartment in the Condo Building.

      c.   In the Bank-4 Application, MA certified, in substance and in part, the following:

        i.   MA was not the owner of any business other than NYIC;

        ii.   The United States was the principal place of residence for all employees of NYIC included in the payroll calculation;

        iii.   Current economic uncertainty makes the loan request necessary to support the ongoing operations of NYIC;

        iv.   NYIC will provide documentation verifying the number of full-time equivalent employees on NYIC's payroll as well as the dollar amounts of payroll costs;

        v.   The information provided in the loan application and in all supporting documents and forms is true and accurate in all material respects; and

        vi.   MA understood that knowingly making a false statement to obtain a guaranteed loan from the SBA is punishable under the law.

      d.   In order to support the representations regarding the number of employees and average monthly payroll for NYIC in the Bank-4 Application, MA submitted the following documents to Bank-4:

        i.   A purported statement for a bank account in the name of NYIC at Bank-2 (the "NYIC Bank-2 Account") for the period from March 27, 2020 through April 27, 2020, which reflected a beginning balance of approximately $10.284 million

and approximately $2.762 million in purported payroll payments on or about April 1, 2020.

       ii.    Purported payment receipts from an insurance company (the "Insurance Company") for group healthcare insurance for NYIC for each month from in or about December 2018 through in or about December 2019.

       iii.    An annual payroll report for NYIC purportedly issued by the Payroll Company, which reflected a total payroll for 2019 of approximately $20.395 million and a total employee count of 313.

     e.    On or about May 14, 2020, after Bank-4 had denied NYIC's PPP loan application and after Bank-1 had frozen Hurley's PPP loan funds pending an investigation, MA emailed Bank-4 and stated, in substance and in part, that NYIC wanted to withdraw and cancel its PPP loan application "because our company does not want the PPP."

<u>The PPP Loan Application for NYIC to Bank-5</u>

25.    Based on my review of records obtained from a financial institution headquartered in San Francisco, California ("Bank-5"), I have learned the following, in substance and in part, regarding a PPP loan application for NYIC submitted by MUGE MA, a/k/a "Hummer Mars," the defendant:

     a.    On or about May 7, 2020, approximately two weeks after MA submitted the Bank-2 Application and approximately ten days after MA submitted the Bank-3 Application and the Bank-4 Application, MA applied to Bank-5 for a $4,885,783.83 PPP loan for NYIC (the "Bank-5 Application").

     b.    The Bank-5 Application for NYIC signed by MA represented, in substance and in part, that NYIC had an average monthly payroll of approximately $1,954,313, had 240 employees, and that the loan funds would be used for payroll and lease/mortgage interest.  The application also represented that MA was the sole owner and executive director of NYIC and a U.S. citizen.  The address listed in the application for NYIC was the sixth floor of the Condo Building, and the address listed for MA was the Ma Apartment in the Condo Building.

     c.    In the Bank-5 Application, MA certified, in substance and in part, the following:

    i.  MA was not the owner of any business other than NYIC;

    ii.  The United States was the principal place of residence for all employees of NYIC included in the payroll calculation;

    iii.  Current economic uncertainty makes the loan request necessary to support the ongoing operations of NYIC;

    iv.  NYIC will provide documentation verifying the number of full-time equivalent employees on NYIC's payroll as well as the dollar amounts of payroll costs;

    v.  The information provided in the loan application and in all supporting documents and forms is true and accurate in all material respects; and

    vi.  MA understood that knowingly making a false statement to obtain a guaranteed loan from the SBA is punishable under the law.

   d. In order to support the representations regarding the number of employees and average monthly payroll for NYIC in the Bank-5 Application, MA submitted the following documents to Bank-5:

    i.  The same purported IRS Forms 941 for each quarter of 2019 provided to Bank-2 in connection with the Bank-2 Application and Bank-3 in connection with the Bank-3 Application.

    ii.  Documents purportedly issued by the Payroll Company addressed to NYIC stating, in substance and in part, that NYIC's payroll for each month from in or about January 2019 through in or about March 2020 had been approved and submitted for processing.

    iii.  A Bank-5 payroll expenses worksheet reflecting a purported average monthly payroll of approximately $1,954,313 and an average number of employees of 240 for the past year.

   e. Bank-5 ultimately denied the PPP loan application.

26.   Based on my training and experience and my participation in this investigation, I know that the deposits of Bank-1, Bank-2, Bank-3, Bank-4, and Bank-5 were insured by the FDIC at all relevant times.

<u>Evidence of MA's Submission of Fraudulent Documents</u>

27.   Based on my review of tax records for NYIC and Hurley obtained from the IRS, I have learned, in substance and in part, that the IRS Forms 941, 1120, and W-3 submitted by MUGE MA, a/k/a "Hummer Mars," the defendant, in connection with the PPP loan applications to Bank-1, Bank-2, Bank-3, and Bank-5, which are summarized above in paragraphs 21(d)(i)-(iii), 22(d)(i)-(vi), 23(d), and 25(d)(i), were never actually filed with the IRS and were fabricated.  Rather, the actual IRS Forms 941 filed by NYIC with the IRS reflect that NYIC did not pay any wages to any employees in 2019.  In addition, NYIC has not filed any IRS Forms 1120 or W-3 for 2019, and Hurley has not filed any tax forms with the IRS.

28.   Based on my review of records and correspondence obtained from the Payroll Company, I have learned the following, in substance and in part:

a.   Hurley has never had an account with the Payroll Company.  Accordingly, the payroll document submitted by MUGE MA, a/k/a "Hummer Mars," the defendant, in connection with the Bank-1 Application, which is summarized above in paragraph 21(d)(iv), was fabricated.

b.   NYIC had an account with the Payroll Company from in or about March 2017 through in or about October 2019.  For the period from January 1, 2018 through October 2019, the only employee of NYIC was MA, who was paid a total of $30,000 for the three pay periods from on or about December 16, 2017 through on or about January 31, 2018.  Accordingly, the payroll documents submitted by MA in connection with the PPP loan applications to Bank-2, Bank-4, and Bank-5, which are summarized above in paragraphs 22(d)(vii), 24(d)(iii), and 25(d)(ii), were fabricated.

29.   Based on my review of correspondence from the Accounting Firm, I have learned, in substance and in part, that NYIC was never a client of the Accounting Firm.  Accordingly, the NYIC audited consolidated financial statements for 2018 and 2019 submitted by MUGE MA, a/k/a "Hummer Mars," the defendant,

in connection with the Bank-2 Application, which are summarized above in paragraph 22(d)(viii), were fabricated.

30. Based on my review of records obtained from Bank-2 for the NYIC Bank-2 Account, I have learned, in substance and in part, the following:

a. Contrary to the statement for the NYIC Bank-2 Account submitted by MUGE MA, a/k/a "Hummer Mars," the defendant, in connection with the Bank-4 Application, which is summarized above in paragraph 24(d)(i) and reflects a beginning balance of approximately $10.284 million on or about March 27, 2020, the actual bank statement for the same period provided by Bank-2 reflects a beginning balance of $510.25 on or about March 27, 2020.

b. Contrary to the statement for the NYIC Bank-2 Account submitted by MA in connection with the Bank-4 Application, which is summarized above in paragraph 24(d)(i) and reflects approximately $2.762 million in purported payroll payments on or about April 1, 2020, the actual bank statement for the same period provided by Bank-2 reflects only a charge of $21.56 on or about April 1, 2020 for newspaper delivery.

c. Based on my comparison of the statement for the NYIC Bank-2 Account provided by MA in connection with the Bank-4 Application and the actual bank statement for the same period provided by Bank-2, it appears that MA also doctored several of the actual debit and credit entries in the statement by adding zeroes or otherwise increasing the amounts in order to inflate the amount of funds appearing in the statement.  For example, the first debit in the actual bank statement provided by Bank-2 reflects a $61.00 debit for a consumer electronics store on or about March 30, 2020, whereas the purported bank statement provided by MA to Bank-4 reflects a debit of $6,100.00 for the same consumer electronics store on the same day.  Similarly, the actual bank statement provided by Bank-2 reflects a credit on or about April 16, 2020 in the amount of $6,292.00, whereas the purported bank statement provided by MA to Bank-4 reflects a credit of $2,200,000.00 on the same day.

d. Accordingly, the purported statement for the NYIC Bank-2 Account submitted by MA in connection with the Bank-4 Application was fabricated.

31. Based on my review of correspondence from the Insurance Company, I have learned, in substance and in part,

that NYIC has never held an insurance policy with the Insurance
Company.  Accordingly, the purported payment receipts from the
Insurance Company submitted by MUGE MA, a/k/a "Hummer Mars," the
defendant, in connection with the Bank-4 Application, which are
summarized above in paragraph 24(d)(ii), were fabricated.

32.  Based on my conversation with a representative of the
company managing the Condo Building, I have learned that the
Condo Building is a residential-only building with no commercial
space and that the sixth floor of the Condo Building, where the
Ma Companies are purportedly located, primarily contains a
lounge and other amenities available for residents.

33.  Based on my review of correspondence with a
representative of U.S. Customs and Border Protection ("CBP"), I
have learned that, contrary to the representations by MUGE MA,
a/k/a "Hummer Mars," the defendant, in the loan applications
described above that he is a U.S. citizen, MA is actually a
Chinese national with lawful permanent resident status since on
or about March 24, 2017.

### Fraudulent Representations by NYIC in Connection with Procurement of COVID-19 Test Kits and PPE

34.  Based on email correspondence I obtained from medical
equipment suppliers to New York State, I have learned the
following, in substance and in part:

a.  On or about April 23, 2020, the day before MUGE
MA, a/k/a "Hummer Mars," the defendant, submitted the Bank-2
Application for NYIC, a purported employee of NYIC ("NYIC
Employee-1") emailed a manufacturer of COVID-19 test kits
headquartered in Canada ("Company-1") and wrote the following,
in substance and in part:  "Our investment bank is representing
New York State Government and the Governor of New York procuring
Testing Kits.  We are interested in ordering Testing Kits in the
huge bulk."  The email then asked for information regarding
Company-1's current stock of testing kits, production capacity
per day, unit price, and payment terms, including whether
Company-1 would accept payment in full upon delivery to a New
York airport.  The email ended with the following:  "Your prompt
response will be greatly appreciated because we are literally
saving lives."  NYIC Employee-1 copied three other email
addresses purporting to belong to NYIC employees on the email,
including one that appears to belong to MA's spouse.  The
signature for NYIC Employee-1 listed the sixth floor of the
Condo Building as the address for NYIC.

       b.   On or about April 27, 2020, the same day MA submitted the Bank-3 Application for NYIC, another purported employee of NYIC ("NYIC Employee-2") emailed a personal protective equipment ("PPE") manufacturer headquartered in Germany ("Company-2") and wrote the following, in substance and in part:  "Our investment bank is representing New York State Government and the Governor of New York procuring personal protective equipment."  The email then listed 12 types of PPE NYIC was interested in procuring, including KN95 masks, protective gowns and goggles, face shields, and ventilators, and stated "[w]e are interested in ordering 100,000,000 units of each of the aforementioned PPEs."  The email then asked for information regarding Company-2's current stock of PPE, production capacity per day, unit price of each PPE listed, and payment terms, including whether Company-2 would accept payment in full upon delivery to a New York airport.  The email ended with the following:  "Your prompt response will be greatly appreciated because we are literally saving lives."  NYIC Employee-2 copied three other email addresses purporting to belong to NYIC employees on the email, including two of the same email addresses that were copied on the email to Company-1, including the email address that appears to belong to MA's spouse.  The signature for NYIC Employee-2 listed the sixth floor of the Condo Building as the address for NYIC.

       c.   On or about May 17, 2020, another purported employee of NYIC ("NYIC Employee-3") emailed Company-2 seeking to procure PPE and requested information from Company-2 regarding, among other things, Company-2's product catalog, pricing structure and payment terms, and current stock of PPE. In the email, NYIC Employee-3 wrote the following, in substance and in part:  "As an investment bank, we are able to pay for the order out of our strong balance sheets. . . . If you would like to speak over the phone, you may call [a phone number ending in 9839 (the "9839 Number")] to speak with our Executive Director who's in charge of the procurement project."

       d.   Based on my familiarity with this investigation, I know that the 9839 Number is the phone number listed by MA in the loan applications described above.

   35.   On or about May 18, 2020, I called the 9839 Number posing as a sales representative of Company-2 and reached MUGE MA, a/k/a "Hummer Mars," the defendant, who identified himself as "Hummer."  During this phone call, which was recorded, MA represented, in substance and in part, that NYIC was a

registered vendor for New York State, among other state
governments, and that NYIC had a big team working on the deal.

36.   Based on my review of correspondence with
representatives of New York State, NYIC is not an authorized
vendor of New York State and does not represent New York State
in procuring COVID-19 test kits or PPE.

WHEREFORE, I respectfully request that a warrant be issued
for the arrest of MUGE MA, a/k/a "Hummer Mars," the defendant,
and that he be arrested and imprisoned or bailed, as the case
may be.

                          s/William R. McKeen by
                           KNF, USMJ
                           WILLIAM R. MCKEEN
                          Special Agent
                          Federal Bureau of Investigation


Sworn to me through the transmission
of this Affidavit by reliable electronic means,
pursuant to Federal Rules of Criminal Procedure
41(d)(3) and 4.1, this 20th day of May, 2020

_____
THE HONORABLE KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK