UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                                       :

  UNITED STATES OF AMERICA,        :

                      - v. -                   :           20 Cr. 407 (RMB)

  MUGE MA,                                  :
      a/k/a "Hummer Mars,"          :

               Defendant.      :
------------------------------------------------------X

## GOVERNMENT'S SENTENCING MEMORANDUM

                                                   DAMIAN WILLIAMS
                                                   United States Attorney for the
                                                   Southern District of New York
                                                   Attorney for the United States of America

Sagar K. Ravi
Assistant United States Attorney
     - Of Counsel

"Congress has passed the 2 TRILLION stimulus package . . . it is the BEST opportunity for you to get money ONCE IN A CENTURY."  That is a chat message the defendant Muge Ma, a/k/a "Hummer Mars," sent on March 27, 2020 describing the Coronavirus Aid, Relief, and Economic Security ("CARES") Act that was enacted the same day.  The CARES Act provided over $300 billion in emergency relief loans to help struggling small businesses that were mostly shuttered as a result of the COVID-19 pandemic and desperately needed money to pay their employees.

Within ten years of entering the United States from China on a student visa and after receiving an MBA at UCLA and earning a six-figure salary for many years, the defendant sought to take advantage of the pandemic and defraud the very country that he now claims to "love" by using egregious lies, fraudulent documents, and stolen identities to trick banks and the U.S. Small Business Administration ("SBA") in an attempt to obtain millions of dollars in pandemic loan relief.  He began committing these crimes within days of the authorization of loan relief under the CARES Act and was one of the highest-profile arrests given the number of fraudulent loan applications the defendant submitted seeking a total of over $20 million from at least six different banks.  The sheer number and type of fraudulent documents the defendant created and submitted to support his lies to the banks – bank records, tax records, insurance records, payroll records, and audited financial statements – is remarkable and demonstrates that this was not simply a single lapse of judgment as the defendant claims, but rather calculated, meticulous criminal conduct intended to carry out a massive fraud on the U.S. Government during a vulnerable time.

Notably, while the defendant sought to wrongly profit from the pandemic by fraudulently obtaining loan relief, he also used the false representation that his company was chosen to

represent New York State to purchase personal protective equipment ("PPE") at discount rates from manufacturers and suppliers in order to try and profit from the scarcity of such equipment at a time when it was needed most.

To reflect the seriousness of the defendant's conduct, to promote just punishment and respect for the law, and to deter this defendant and others like him, the Government respectfully requests that the Court impose a below-Guidelines sentence of 42 months in prison for the bank fraud in Count Two, followed by the mandatory minimum consecutive sentence of two years in prison for the aggravated identity theft in Count Eight, for a total term of imprisonment of 66 months. The Probation Department has recommended a total sentence of 75 months' imprisonment. (Presentence Investigation Report revised Nov. 3, 2021 ("PSR") at 32.)

I. **OFFENSE CONDUCT**

    A. **The Loan Fraud Scheme**

At the height of the COVID-19 pandemic in 2020, Ma sought to fraudulently obtain millions of dollars in Government-guaranteed loans intended to help businesses and employees struggling during the pandemic.

The CARES provided emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of hundreds of billions of dollars in forgivable loans to small businesses to pay for payroll, mortgage interest, rent, and/or utilities through the Paycheck Protection Program ("PPP"). Pursuant to the CARES Act, the amount of PPP funds a business was eligible to receive was determined by the number of employees employed by the business and their average payroll costs. Businesses applying for a PPP loan must provide documentation to confirm that they have in the past paid employees the

compensation represented in the loan application. The CARES Act also expanded the separate Economic Injury Disaster Loan ("EIDL") Program, which provided small businesses with low-interest loans of up to $150,000 to help overcome the temporary loss of revenue they were experiencing due to COVID-19. To qualify for an EIDL under the CARES Act, the applicant must have suffered "substantial economic injury" from COVID-19, based on a company's actual economic injury determined by the SBA.

From the end of March 2020 through mid-May 2020, a period of approximately six weeks, Ma applied to the SBA and six different banks for a total of over $20 million in government-guaranteed loans for two companies he owned, New York International Capital LLC ("NYIC") and Hurley Human Resources LLC ("Hurley"), through the SBA's PPP and EIDL Program. In connection with these loan applications, Ma falsely represented, among other things, that his companies together had hundreds of employees and paid millions of dollars in wages to those employees on a monthly basis. In fact, however, Ma appears to have been the only paid employee of his companies since 2019. In order to support the false representations in the loan applications about the number of employees at and the wages paid by his companies, Ma submitted fraudulent and doctored bank records, tax records, insurance records, payroll records, and/or audited financial statements. Below is a brief description of the fraudulent loan applications submitted by Ma.

First, on March 30, 2020, within three days of the passing of the CARES Act, Ma submitted an application to the SBA for an EIDL Program loan for NYIC. This EIDL application for NYIC represented, in substance and in part, that NYIC had 197 employees and had gross revenues of $2.9 million for the 12 months prior to the COVID-19 disaster. Ma also included a link to the NYIC website in email correspondence with the SBA, which, among other

3

things, contained the following representations about NYIC: (i) "NYIC is a patriotic American CLOUD-based Management Consulting firm headquartered in Manhattan, New York City"; (ii) "NYIC has the unique ability to deploy HUNDREDS of brilliant, hard-working & passionate young professionals"; and (iii) "Coordinated by the Manhattan New York City headquarters, NYIC's MULTIPLE TEAMS spread over the entire country work SEAMLESSLY connecting YOU with the world's BLUE-CHIPs and make them as your strategic partners." The NYIC website also contained photos of Ma and other purported employees of NYIC meeting with government and business leaders around the world, including a former New York State Governor and a former New York City Mayor. On April 15, 2020, an EIDL advance of $10,000 was deposited into NYIC's bank account, which had a negative balance prior to the deposit, and a portion of those funds were spent at a consumer electronics store, a department store, and to pay credit card bills. Subsequently, on April 27, 2020, the SBA authorized a $500,000 EIDL to NYIC but it was not disbursed prior to Ma's arrest.

 Second, also on March 30, 2022, Ma submitted an application to the SBA for an EIDL Program loan for Hurley. This EIDL application for Hurley represented, in substance and in part, that Hurley had 147 employees and had gross revenues of $1.51 million for the 12 months prior to the COVID-19 disaster. In email correspondence with the SBA, Ma provided a link to Hurley's website and provided a company profile for Hurley, which stated, among other things, that "the short-term strategic goal of HURLEY HR is preventing an irreversible disruption of its operation caused by the pandemic." Notably, the Hurley website stated, among other things, that "HURLEY HR offers products and services on a global scale," and a section of the Hurley website titled "Global Capabilities" contained photos depicting and listing 13 cities around the world. On April 15, 2020, an EIDL advance of $10,000 was deposited into Hurley's bank

4

account, $9,500 of which was transferred to NYIC. On May 13, 2020, the SBA authorized a $150,000 EIDL to Hurley, which was placed on hold as a result of the investigation of Ma.

Third, on April 20, 2020, Ma applied to a bank ("Bank-1") for a $4,859,500 PPP loan for Hurley. The loan amount requested by Ma was subsequently reduced to $813,250 in an amended PPP loan application dated May 6, 2020. The application falsely represented that Hurley had an average monthly payroll of approximately $325,300, had 163 employees, and that the loan funds would be used for payroll, lease/mortgage interest, and utilities. In order to support the false representations in this application, Ma submitted (i) a fraudulent IRS Form 941 for the first quarter of 2019, which reported that Hurley had 158 employees who were paid a total of approximately $975,900 during the period; (ii) a fraudulent IRS Form W-3 for 2019, which reported a total number of 158 Forms W-2 filed for employees and a total of approximately $3.904 million paid to employees in 2019; (iii) a fraudulent IRS Form 1120 for 2019, which reported gross revenues of approximately $6.789 million and salaries and wages paid of approximately $3.904 million (*see* Exhibit A)[1]; (iv) a fraudulent document that appeared to be issued by a payroll company (the "Payroll Company"), which stated that Hurley's payroll for the last period in 2019 had been approved and submitted for processing (*see* Exhibit B); and (v) a description of Hurley's business, which stated the following, in substance and in part: "About 70% of our employees are managers who manage our engaged institutional and individual clients as well as the managers' associates. The rest of our staff are our administrative executives who focus on running our company's day-to-day operation in various aspects" (*see* Exhibit C). On May 6, 2020, Bank-1 approved a $813,250 PPP loan to Hurley, which was

---

[1] Because the exhibits referenced herein contain personal identifying information for the defendant as well as victims, the Government will be providing them to the Court and respectfully requests that the exhibits be filed under seal.

disbursed to Hurley's account at Bank-1 on May 13, 2020.  As a result of the investigation of Ma, however, the loan funds and other accounts held by Ma at Bank-1 were frozen.

Fourth, on April 20, 2020, the same day as the submission of the PPP application for Hurley to Bank-1, Ma applied to a second financial institution ("Bank-2") for a $4,474,654 PPP loan for NYIC.  This application to Bank-2 falsely represented, in substance and in part, that NYIC had an average monthly payroll of approximately $1,789,862, had 313 employees, and that the loan funds would be used for payroll and lease/mortgage interest.  In order to support the false representations in this application, Ma submitted (i) a Bank-2 addendum to the loan application which listed 20 purported employees of NYIC and their 2019 gross pay, including Ma's wife and his former girlfriend, who both were falsely represented to earn over $90,000 each (*see* Exhibit D); (ii) a fraudulent IRS Form 1120 for 2019, which reported gross revenues of approximately $41.7 million and salaries and wages paid of approximately $29.6 million; (iii) fraudulent Form 941s for each quarter of 2019, which reported that NYIC had over 420 employees over that time period that were paid a total of more than approximately $6.8 million each quarter (*see* Exhibit E); (iv) fraudulent payment receipts from an insurance company (the "Insurance Company") for group healthcare insurance for NYIC for each month from December 2018 through December 2019 (*see* Exhibit F); and (v) a fraudulent annual payroll report for 2019 purportedly issued by the Payroll Company (*see* Exhibit G).  Bank-2 ultimately denied the PPP loan application based on potential fraud.

Fifth, on April 24, 2020, four days after the submission of the PPP applications for Hurley and NYIC to Bank-1 and Bank-2 respectively, Ma applied to a third financial institution ("Bank-3") for a $6,174,658 PPP loan for NYIC.  This application to Bank-3 falsely represented, in substance and in part, that NYIC had an average monthly payroll of approximately

6

$2,469,863, had 483 employees, and that the loan funds would be used for payroll and lease/mortgage interest.  In order to support the false representations in this application, Ma submitted (i) the same fraudulent IRS Form 941s for each quarter of 2019 which were provided to Bank-2; (ii) a fraudulent IRS Form W-3 for 2019, which reported a total number of 458 Forms W-2 filed for employees and a total of approximately $29.638 million paid to employees in 2019 (*see* Exhibit H);  (iii) a fraudulent IRS Form 1120 for 2019, which reported gross revenues of approximately $41.744 million and salaries and wages paid of approximately $29.638 million; (iv) a fraudulent document that appeared to be issued by the Payroll Company, which stated that NYIC's payroll for the last period in March 2020 had been approved and submitted for processing; and (v) audited consolidated financial statements for 2018 and 2019 purportedly certified by a "Big Four" accounting firm (the "Accounting Firm"), which reported total revenues of approximately $41.744 million in 2019 and $30.921 million in 2018, and total assets of approximately $34.078 million in 2019 and $26.482 million in 2018 (*see* Exhibit I).  Some of these fraudulent documents were submitted by Ma using email addresses that were in the name of his wife and former girlfriend (*see* Exhibit L).  Bank-3 ultimately denied the PPP loan application based on potential fraud.

Sixth, on April 27, 2020, three days after Ma submitted the application to Bank-3, Ma applied to a fourth financial institution ("Bank-4") for a $4,464,600 PPP loan for NYIC.  This application to Bank-4 falsely represented, in substance and in part, that NYIC had monthly payroll costs of approximately $1,789,861, had over 250 employees, and that the loan funds would be used for payroll and lease/mortgage interest.  In order to support the false representations in the application, Ma submitted to Bank-4 the same purported IRS Forms 941

for each quarter of 2019 provided to Bank-2 and Bank-3 and the same purported IRS Form W-3 provided to Bank-3. Bank-4 ultimately denied the PPP loan application based on potential fraud.

Seventh, on April 28, 2020, one day after Ma submitted the application to Bank-4, Ma applied to a fifth financial institution ("Bank-5") for a $4,484,654 PPP loan for NYIC. This application to Bank-5 falsely represented, in substance and in part, that NYIC had an average monthly payroll of approximately $1,605,410, had 313 employees, and that the loan funds would be used for payroll and lease/mortgage interest. In order to support the false representations in this application, Ma submitted (i) a doctored statement for a bank account in the name of NYIC at Bank-3 for the period from March 27 through April 27, 2020, which reflected a beginning balance of approximately $10.284 million and approximately $2.762 million in purported payroll payments on April 1, 2020 (*see* Exhibit J), when in fact, the beginning balance was only $510.25 and the only charge on April 1, 2020 was $21.56 for newspaper delivery; (ii) fraudulent payment receipts from the Insurance Company for group healthcare insurance for NYIC for each month from in or about December 2018 through in or about December 2019; and (iii) a fraudulent annual payroll report for NYIC purportedly issued by the Payroll Company, which reflected a total payroll for 2019 of approximately $20.395 million and a total employee count of 313. Bank-5 ultimately denied NYIC's PPP loan application.

Finally, on May 7, 2020, approximately two weeks after Ma submitted the PPP application to Bank-3 and approximately ten days after Ma submitted the PPP application to Bank-5, Ma applied to a sixth financial institution ("Bank-6") for a $4,885,783 PPP loan for NYIC. This application to Bank-6 falsely represented, in substance and in part, that NYIC had an average monthly payroll of approximately $1,954,313, had 240 employees, and that the loan funds would be used for payroll and lease/mortgage interest. In order to support the false

representations in this application, Ma submitted (i) the same purported IRS Forms 941 for each quarter of 2019 provided to Bank-2, Bank-3, and Bank-4; (ii) documents purportedly issued by the Payroll Company addressed to NYIC stating that NYIC's payroll for each month from in or about January 2019 through in or about March 2020 had been approved and submitted for processing; and (iii) a payroll expenses worksheet reflecting a purported average monthly payroll of approximately $1,954,313 and an average number of employees of 240 for year prior to application (*see* Exhibit K). Bank-6 ultimately denied NYIC's PPP loan application.

As noted above, Ma succeeded in tricking Bank-1 to approve a $813,250 PPP loan to Hurley on May 6, 2020. Shortly thereafter, Ma began to conduct Internet searches relating to fraud and the PPP and EIDL Program. For example, on May 8, 2020, Ma conducted a search for "ppp fraud investigation." Then, the next day, on May 9, 2020, he searched for "eidl loan fraud" and accessed a National Law Review article titled "COVID-19 Update: Federal Investigators Prepare to Investigate and Prosecute Fraud in Emergency Loan Programs." On May 13, 2020, Ma searched for "bank fraud defence lawyer," "bank fraud investigator interview questions," and "bank fraud cases," and he also accessed articles titled "How long does it take for a bank to investigate fraud?" and "What is the process banks use to investigation fraud?" as well as the Wikipedia article for "Bank fraud." That same day, on May 13, 2020, the $813,250 PPP loan to Hurley was disbursed to Hurley's account at Bank-1. However, as a result of the Government's investigation, the bank account for Hurley was frozen on May 12, 2020, thereby preventing any funds from being withdrawn by Ma. Within two hours after the Hurley account at Bank-1 was frozen, Ma sent an email to Bank-1 seeking to return the PPP loan and he subsequently sent emails to the other banks and the SBA seeking to withdraw any pending loan applications.

Even after Ma had learned his accounts were frozen and he had withdrawn his loan applications, Ma continued to conduct Internet searches relating to his fraudulent conduct. Specifically, on May 16, 2020, Ma searched for "mail and wire fraud" and accessed an article titled " DOJ Reviewing PPP Loan Applications for Criminal Fraud, Finding 'Red Flags.'" Ma was then arrested five days later on May 21, 2020.

### B. The PPE Scheme

At the same time that the defendant was seeking to commit fraud through the PPP and EIDL Program, he and other individuals purporting to work for NYIC under his direction, fraudulently represented to a COVID-19 test kit manufacturer, a medical equipment supplier, and other PPE suppliers that NYIC was representing New York State Government in procuring COVID-19 test kits and personal protective equipment to respond to the COVID-19 pandemic. In chats that the defendant sent (while using his wife's identity) on April 3, 2020, the defendant told his team the following:

> Three important updates:  1) we have got a mandate of Governor Cuomo, the governor of New York state to procure PPEs on behalf of his team;  2) all KN95 respirators (masks) have been approved by FDA to import;  3) CDC has made an announcement recommending all 350 million Americans to put a mask on when going out. **Therefore, all teams and all people must start reaching out to Chinese large companies, listed either on Shanghai or on Hong Kong, to procure PPEs on behalf of the governor. . . .** Everyone MUST make sure ALL PEOPLE on your team understand the assignment and the significance of it. **Save lives & making money - many lives and a lot of money**  (Emphasis in original.)

These representations were simply false.  NYIC is not and has never been an authorized vendor of New York State, nor has NYIC been authorized to represent New York State in connection with the procurement of COVID-19 supplies.  Nevertheless, the defendant also provided a

template outreach email to PPE suppliers for his team to use which contained the same false statements as above.

For example, beginning in early April 2020, purported NYIC employees inquired with a PPE supplier based in China ("Company-1") about ordering KN95 masks, surgical masks, and ventilators in bulk quantities. During this outreach, NYIC employees stated, in substance and in part, that "[o]ur investment bank is representing New York State Government and the Governor of New York procuring personal protective equipment," and that "[y]our prompt response will be greatly appreciated because we are literally saving lives." When Company-1 responded and indicated that payment needed to be made in advance of delivery of any PPE, the NYIC employee responded with the following on April 8, 2020: "We got the mandate from the governor of New York state. For this reason, we will be able to order a large amount of units with good price. We are able to issue a legally binding and enforceable purchase order contract that guarantees the full payment upon delivery. Please let me know your thoughts on it." (*See* Exhibit M.)

As another example, on April 23, 2020, three days after Ma submitted the PPP loan applications to Bank-1 and Bank-2, a purported employee of NYIC acting under Ma's direction emailed a manufacturer of COVID-19 test kits headquartered in Canada ("Company-2") and wrote the following, in substance and in part: "Our investment bank is representing New York State Government and the Governor of New York procuring Testing Kits. We are interested in ordering Testing Kits in the huge bulk." The email then asked for information regarding Company-2's current stock of testing kits, production capacity per day, unit price, and payment terms, including whether Company-2 would accept payment in full upon delivery to a New York airport. The email ended with the following: "Your prompt response will be greatly appreciated

11

because we are literally saving lives." The email from NYIC copied three other email addresses purporting to belong to NYIC employees on the email, including one that was in the name of Ma's wife.

For a final example, on April 27, 2020, the same day Ma submitted the PPP loan application to Bank-4, another purported employee of NYIC emailed a PPE manufacturer headquartered in Germany ("Company-3") and wrote the following, in substance and in part: "Our investment bank is representing New York State Government and the Governor of New York procuring personal protective equipment." The email then listed 12 types of PPE NYIC was interested in procuring, including KN95 masks, protective gowns and goggles, face shields, and ventilators, and stated "[w]e are interested in ordering 100,000,000 units of each of the aforementioned PPEs." The email then asked for information regarding Company-3's current stock of PPE, production capacity per day, unit price of each PPE listed, and payment terms, including whether Company-3 would accept payment in full upon delivery to a New York airport. The email ended with the same statement as the emails discussed above: "Your prompt response will be greatly appreciated because we are literally saving lives." The NYIC employee copied three other email addresses purporting to belong to NYIC employees on the email, including two of the same email addresses that were copied on the email to Company-2, including the email address that is in the name of Ma's wife.

The Government is not aware of any PPE that NYIC successfully obtained as a result of the fraudulent misrepresentations above.

## II.   DISCUSSION

### A.   Applicable Law and Guidelines Range

The United States Sentencing Guidelines continue to provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397

F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

In the Presentence Investigation Report, the United States Probation Office calculated an applicable Guidelines range of 51 to 63 months for Count Two, which is also in accordance with the parties' plea agreement. Probation recommended a Guidelines sentence of 51 months on Count Two, followed by the mandatory minimum consecutive sentence of two years on Count Eight, for a total recommended sentence of 75 months in prison.

### B. The Nature and Circumstances of the Offenses and the Need for Punishment Weigh In Favor of a Significant Sentence

The defendant's crimes were extremely serious. As soon as the CARES Act was passed, the defendant saw it as an opportunity to enrich himself. While small businesses across the United States were struggling to make ends meet, the defendant had the audacity to lie to the SBA and six different banks in an attempt to get millions of dollars in pandemic relief under the guise of using those funds to pay wages to hundreds of needy employees that never existed. And these were not simple lies, nor were they a "temporary lapse in judgment" as the defendant claims. (*See* ECF No. 61 ("Def. Mem.") at 8.) As is apparent from the exhibits that are attached to this submission, over a period of approximately six weeks, the defendant painstakingly fabricated a multitude of documents to support his false representations in the loan applications, which included bank records, tax records, insurance records, payroll records, and audited financial statements. Moreover, he used the identities of people he knew, including his wife and former girlfriend, to submit fraudulent documents in connection with the loan applications. As Probation determined, the defendant used these identities to falsely portray his companies as legitimate companies with multiple employees, in the same way that he used his companies' websites to falsely portray them as "global" even though he was the only paid employee.

The defendant makes much of the fact that he withdrew and cancelled his loan applications prior to receiving any money. (Def. Mem. at 8-9.) While that may be true, the

14

record is clear that the defendant did so only after his account at Bank-1 that was to receive over $800,000 in PPP loan funds had been frozen as a result of the investigation. Moreover, the Internet searches conducted by the defendant demonstrate that the defendant likely withdrew his fraudulent loan applications because he was worried that he was under investigation. During the week before he withdrew his loan applications, the defendant began conducting online searches for "ppp fraud investigation" and "eidl loan fraud," and he also accessed an article titled "COVID-19 Update: Federal Investigators Prepare to Investigate and Prosecute Fraud in Emergency Loan Programs." This demonstrates that the defendant withdrew his loan applications not because of some change of heart, but rather because he feared he would be investigated and prosecuted for his criminal conduct and wanted to avoid getting caught.

In addition to the defendant's attempts to fraudulently obtain millions of dollars in pandemic relief, the defendant also sought to obtain PPE during the beginning of the pandemic through false representations that NYIC was representing New York State in procuring PPE. Importantly, the defendant used this false representation that NYIC was an agent of New York State in order to convince suppliers to deliver PPE on credit without payment in advance, which would enable the defendant to procure PPE to sell without taking on any risk or needing any capital.

As the defendant said in his own words, his true goal in all of this was to make money. The defendant's brazen criminal conduct in an effort to take advantage of a national emergency constitutes extraordinarily serious conduct that warrants significant punishment. For these reasons, the nature and circumstances of the defendant's conduct and the need for just punishment warrant a total sentence of at least 66 months.

### C. A Guidelines Sentence Is Necessary to Promote Respect for the Law and Afford Adequate Deterrence to Criminal Conduct

The need to afford adequate deterrence to both the defendant and the public generally also weighs strongly in favor of a significant term of imprisonment. When the defendant committed the instant offense, he had obtained an MBA, had earned a six-figure salary for several years, and was living in a $1.5 million condo in Manhattan. He also had "an immensely strong and supportive family and support structure" (Def. Mem. at 3), as evidenced by the many letters of support provided to the Court in connection with sentencing. Despite all of this support and the fact that the defendant was certainly aware of the legal and immigration consequences of his criminal conduct, the defendant chose to engage in the instant offense. The fact that the defendant would put so much at risk despite what appears to be substantial family and community support is indicative of the need for specific deterrence.

At bottom, the defendant committed this crime for one reason: greed. Unlike many defendants who commit financial crimes, the defendant did not have a struggling family to support or any other sympathetic circumstances. Rather, he came from an "exceptionally wealthy" family. (PSR ¶ 75.) It is unfortunate that the defendant's parents' businesses in China have suffered as a result of the pandemic, but the defendant's illegal actions were not the result of any financial struggle. Accordingly, a significant sentence is necessary to discourage the defendant from committing further crimes and to impress upon him the serious consequences of his criminal conduct.

Importantly, a strong message is also needed to deter others from lying to fraudulently secure scare government funds during a national emergency. Such a message is particularly important at a time when such crimes involving pandemic relief, which are often difficult to detect and prosecute, have become rampant. Indeed, Congress's Select Subcommittee on the

16

Coronavirus Crisis identified up to approximately $84 billion in potentially fraudulent loans in the PPP and EIDL Programs.[2] Accordingly, the sentence imposed must demonstrate that the consequences of committing these types of fraud are severe.

### D. The Defendant's Requested Sentence Is Contrary to Law and Wholly Inadequate

The defendant seeks a sentence of two years' imprisonment on the aggravated identity theft in Count Eight, "to run consecutive to a sentence of time served on the Bank Fraud" in Count Two. (Def. Mem. at 2, 15.) Based on this proposed sentence, the defendant would have a release date in January 2022 after receiving good time credit. (*See* Def. Mitigation Report at 18.) The defendant's recommended sentence is contrary to law and wholly insufficient to achieve the purposes of sentencing, as discussed above.

First, the "aggravated identity theft statute provides that 'in determining any term of imprisonment to be imposed for the [underlying] felony' — here, Count [Two] — the [Court] 'shall not in any way reduce the term to be imposed for such crime so as to compensate for, or otherwise take into account' the two-year mandatory consecutive sentence for the aggravated identity theft offense." *United States v. Mends*, 412 F. App'x 370, 375 (2d Cir. 2011) (quoting 18 U.S.C. § 1028A(b)(3)); *see also Dean v. United States*, 137 S. Ct. 1170, 1177–78 (2017) (explaining that § 1028A serves as an example that "Congress has been aware of a clear way to bar consideration of a mandatory minimum"). Based on the defendant's recommended sentence, the defendant believes he should not receive any prison time whatsoever for the multiple acts of bank fraud that he committed. Such a sentence would be wholly unreasonable.

---

[2] *See* https://coronavirus.house.gov/sites/democrats.coronavirus.house.gov/files/2020-03-25%20Staff%20Memo%20-%20Small%20Business%20Fraud.pdf.

Second, the defendant suggests that his sentence should be more lenient because of the harsh conditions of confinement due to the global pandemic. (Def. Mem. at 9-10.) While conditions of imprisonment during the pandemic were undeniably difficult, given the steep learning curve the entire world faced in figuring out how to respond to the threat of COVID-19, and the need for physical distancing in order to control the spread of the virus, those conditions do not negate the need for a very significant sentence here. This is particularly true where, as here, the defendant chose to commit fraud during the pandemic, by seeking to exploit a pandemic relief program, thereby assuming the clear risk of ending up in jail during the pandemic.

Finally, the cases outside of this District cited by the defendant in support of a two-year sentence are not persuasive. (*See* Def. Mem. at 12-14.) As the defendant concedes, none of the cases he cites involve a conviction for aggravated identity theft requiring a two-year consecutive sentence that could not be considered in determining the sentence on the predicate counts of conviction. Further, many of the cases cited by the defendant involve significantly lower loss amounts and lower Guidelines ranges. *See, e.g., U.S. v. Jaafar*, 20 Cr. 185 (E.D. Va.) (12-month sentence where Guidelines range was 24 to 30 months); *U.S. v. Tezna*, 21 Cr. 77 (E.D. Va.) (18-month sentence where Guidelines range was 21 to 27 months); *U.S. v. Suber*, 20 Cr. 110 (E.D. Va.) (24-month sentence where Guidelines range was 33 to 41 months); *U.S. v. Baker*, 20 Cr. 20355 (E.D. Mich.) (24-month sentence where Guidelines range was 30 to 37 months). Finally, as the Court is aware, the unwarranted disparities that informed the statutory concern in 18 U.S.C. § 3553(a)(6) "were not those between any two discrete cases or even between two defendants in the same case. Rather, Congress's objective was to eliminate unwarranted disparities nationwide." *United States v. Toohey*, 132 F. App'x 883, 886 (2d Cir. 2005) (internal quotation

18

marks and citations omitted). To that end, based on data provided by the Judiciary Sentencing Information tool provided by the U.S. Sentencing Commission[3], the Government notes that during the last five fiscal years from 2017 through 2021, there were 51 defendants who had the same Guidelines range of 51 to 63 months as the defendant calculated under U.S.S.G. § 2B1.1 and who were convicted of at least one count of aggravated identity theft. Of those 51 defendants, the average length of imprisonment imposed was 63 months and the median length of imprisonment imposed was 64 months. The Government respectfully submits that the defendant's request for a total sentence of two years is wholly insufficient to achieve the purposes of sentencing.

**III.     Conclusion**

For all the reasons set forth above, the Government respectfully submits that a sentence of 42 months on Count Two, followed by the mandatory minimum sentence of two years on Count Eight, for a total sentence of 66 months, is sufficient, but not greater than necessary, to achieve the legitimate goals of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: *[signature]*
Sagar Ravi
Assistant United States Attorney
(212) 637-2195

---

[3] *See* https://jsin.ussc.gov. The figures provided exclude defendants who received a §5K1.1 substantial assistance departure.