M4LKMUGS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          20 CR 407 (RMB)

5   MUGE MA,

6              Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           April 21, 2022
9                                          9:00 a.m.

10  Before:

                    HON. RICHARD M. BERMAN,
11
                                           District Judge
12
                            APPEARANCES
13

14  DAMIAN WILLIAMS
         United States Attorney for the
15       Southern District of New York
    SAGAR RAVI
16       Assistant United States Attorney

17  PETER NEIL KATZ
         Attorney for Defendant
18

19  ALSO PRESENT:

20  WILLIAM McKEEN, Special Agent, FBI
    LESLIE LOCKWOOD, MSW
21

22

23

24

25

M4LKMUGS

1           THE COURT:  As you all know, we are here today for a

2     sentencing.  I see we have some guests.  They're very welcome,

3     of course, to be here.  And, also, just to give you a heads-up,

4     I have reviewed all the submissions, which are quite

5     impressive, I have to say.

6           So the job of sentencing is a difficult one.  Since

7     mid-2005/'6, '7, we know that since then, as a result of

8     Supreme Court decisions, the United States sentencing

9     guidelines are no longer mandatory, haven't been now since

10    then, and, instead, we look at the factors at 18, United States

11    Code, Section 3553(a) in fashioning a fair and reasonable

12    sentence, and I have done that before coming out on the bench

13    today.

14          Those factors include:  The nature and the

15    circumstances of the offense, as well as the history and

16    characteristics of Mr. Ma; the need for the sentence imposed to

17    reflect the seriousness of the offense; to promote respect for

18    the law; to provide a just punishment; to afford adequate

19    deterrence, both individual and general, to criminal conduct;

20    to protect the public from further crimes; to provide Mr. Ma,

21    the defendant, with needed educational or vocational training,

22    medical care, or other correctional treatment in the most

23    effective manner.  And in doing all that, we look at the kinds

24    of sentences available, the kinds of sentences in the

25    sentencing range established in the sentencing guidelines, even

M4LKMUGS

1    though, as I said before, those are no longer mandatory.  We

2    look at any policy statements that may have been issued by the

3    U.S. Sentencing Commission that may apply.  We seek to avoid

4    unwarranted sentence disparities among similarly situated

5    defendants.  Here, there's somewhat of a disagreement between

6    the government and the defense, if I read the materials

7    correctly, as to what would be a disparity and what wouldn't.

8    And I don't believe this is a restitution case, but, where

9    that's applicable, we also consider restitution.

10          Mr. Ma is 38.  He is married, a citizen of China, and

11   a permanent resident of the United States.  He has a Bachelor's

12   degree from Northeastern University in China and an M.B.A. from

13   UCLA in California.  He also has a Master's degree in science

14   from Goldey-Beacom College in Delaware.

15          Mr. Ma is an only child.  His parents, who are Chinese

16   citizens, have been residing in Manhattan.  They both have

17   health issues.  According to the presentence investigation

18   report, prior to Mr. Ma's incarceration, he had assisted his

19   parents financially and also took care of their daily needs,

20   including taking them to medical appointments.

21          Mr. Ma advised probation that he was born and raised

22   in China.  His parents were very wealthy, but were always busy

23   with work and had little time for him.  As a child, Mr. Ma was

24   obese and was often ridiculed and/or abused by others,

25   especially in school, as a result of his physical appearance.

M4LKMUGS

1          The presentence report states that this abuse

2     manifested itself with eating disorders and then extreme

3     exercise regime with a possible addiction to stimulant

4     supplements.

5          The presentence report also states that Ma suffers

6     from dental issues and low testosterone.  He appears to suffer

7     from anorexia and bulimia and has past issues with paranoia.

8     He also takes an unhealthy amount of stimulant supplements to

9     enable him to exercise for several hours a day in addition to

10    his limited caloric intake.

11         According to Mr. Ma's mother, he, Mr. Ma, may suffer

12    from obsessive compulsive disorder and eating disorder.

13         Mr. Ma's wife was interviewed by probation.  She did

14    not disclose where she was residing and considers herself a

15    victim of Mr. Ma's acts, as he stole her identity during the

16    course of the commission of financial crimes.

17         The presentence report notes that there were two

18    reported alleged domestic violence incidents between the

19    defendant and his wife, and that occurred during the marriage.

20    That's in the presentence report at paragraphs 69 to 71.

21         The defendant advised probation that his wife suffers

22    from depression and anxiety.

23         Mr. Ma has advised probation, also, that he would like

24    to engage in mental health treatment and marriage counseling

25    with his wife.  That's found in the presentence report at

M4LKMUGS

1    paragraph 80.

2              The defendant also advised probation that he intends

3    to be a fitness trainer in jail and tutor other inmates.  Upon

4    his release, he hopes to run his companies again, and aspires

5    to work as an M.B.A. application and scholarship consultant or

6    advisor.

7              Mr. Ma committed these offenses through relief and

8    benefits provided under the Coronavirus Aid, Relief, and

9    Economic Security Act, otherwise known as the CARES Act.  The

10   CARES Act authorized forgiving loans to small businesses for

11   job retention and other expenses through a Payment Protection

12   Program, and the CARES Act also expanded an economic injury

13   disaster loan program that provided small businesses with

14   low-interest loans.

15             According to the presentence report, Mr. Ma had been

16   the executive director of New York International Capital since

17   June 20, 2016, and the executive director, also, of Hurley

18   Resources since January 18, 2019, and he applied for relief

19   under both programs for both of his companies.

20             The presentence report states that from at least in or

21   about March 2020 through May 2020, Mr. Ma applied to the SBA

22   and at least five banks for a total of 20 million dollars in

23   government-guaranteed loans for the Ma companies through the

24   SBA's PPP and EIDL programs.  In connection with these loan

25   applications, Mr. Ma represented that he was the sole owner and

M4LKMUGS

executive director of the Ma companies, that the Ma companies
were located on the sixth floor of a luxury condominium
building in Manhattan, and that his companies, NYIC and Hurley,
together had hundreds of employees and paid millions of dollars
in raises to those employees on a monthly basis.  In fact,
however, as described below, and as I will go into, Mr. Ma
appeared to have been the only employee of NYIC since at least
2019, and Hurley, the other company, does not appear to have
any employees.

            In order to support the false representations Ma made
in the loan applications about the number of employees at, and
the wages paid by, Ma companies, Mr. Ma submitted fraudulent
and doctored bank records, tax records, insurance records,
payroll records, and/or other financial statements to at least
five banks.  That's in the presentence report at paragraph 47.

            According to the presentence report, also, before the
discovery of the fraudulent conduct by Ma, the SBA approved a
$500,000 EIDL program loan for NYIC and a $150,000 EIDL program
loan for the other company, Hurley, and a $10,000 loan advance
was provided to NYIC.

            In addition, a bank approved and disbursed
approximately $8,000 in PPP loans for Hurley, which were
fraudulent, in connection with the investigation of this case.

            As a result, Mr. Ma sought to withdraw his loan
applications from the financial institutions and return the

M4LKMUGS

1    funds.  Furthermore, Mr. Ma and individuals purporting to work

2    for NYIC fraudulently represented to a COVID-19 test kit

3    manufacturer and medical equipment supplier that NYIC was

4    representing the New York State Government and the governor of

5    New York in procuring COVID-19 test kits and personal

6    protective equipment to respond to the COVID-19 pandemic.

7              NYIC was not, however, an authorized vendor of New

8    York State, nor has NYIC been authorized to represent New York

9    State in connection with the procurement of COVID-19 supplies.

10             The presentence report also states that in connection

11   with the submission of a fraudulent loan application and

12   supporting documentation, Mr. Ma falsely used the identity of

13   another person, his wife, and a former girlfriend.  That's in

14   the presentence report at paragraph 49.

15             Mr. Ma has prior employment as a vice president of

16   China Merchant Bank in New York City.  According to the

17   presentence report, he was terminated from this position "due

18   to misconduct, as he was found to be untruthful.  He violated

19   the bank's security policy about visitors and was

20   insubordinate."  Paragraph 92 of the presentence report.

21             The defendant was also previously employed at HT

22   Capital in New York City and at Citigroup in China.  He has no

23   prior criminal history.

24             By submission, dated April 4, 2022, the defense

25   requests a sentence of 24 months, namely, time served, on the

M4LKMUGS

1    bank fraud count, followed by 24 months consecutive on the

2    aggravated identity theft count.

3          Among other things, the defense argues that the

4    defendant has accepted responsibility and expressed remorse for

5    his actions, and the defense argues that his remorse began when

6    he voluntarily withdrew and canceled the loan applications.

7          The defense also argues that defendant has suffered

8    while in detention as a result of the harsh conditions imposed

9    by the pandemic, as well as suffering from COVID.  And defense

10   counsel also states that the defendant was subject to

11   anti-Asian prejudice and hate crimes and abuse by fellow

12   inmates and presumed guards.

13         Defense counsel has also submitted a mitigation

14   report, which has a forensic evaluation prepared by Leslie

15   Lockwood, MSW, and dated April 2, 2022.  Ms. Lockwood states

16   that her report is based upon in-person, telephonic, and video

17   interviews conducted with Mr. Ma, as well as written

18   communications with his mother.  In addition, Ms. Lockwood

19   reviewed the charging instruments, the plea agreement, and the

20   presentence report.

21         She describes the torment and abuse Mr. Ma suffered as

22   a child as a result of his physical appearance, and how, at the

23   approximate age of 18, he changed his eating habits and his

24   lifestyle.  Ms. Lockwood also describes the ailments defendant

25   suffers, including, among other things, anorexia, bulimia,

M4LKMUGS

1    gynecomastia, and dental issues.  And Ms. Lockwood describes

2    the difficulties faced by the defendant and his family living

3    in China and the current difficulties faced by his parents

4    while residing in New York, as well as difficulties faced by

5    the defendant while incarcerated during the pandemic.

6          Ms. Lockwood also details the defendant's progress in

7    school and professionally, including his self-taught fluency in

8    the English language.  And Ms. Lockwood describes the

9    relationship between the defendant and his wife.  Ms. Lockwood

10   states that the defendant's wife grew up in a strict household,

11   and that her parents retaliated against her choice to attend

12   NYU by claiming she had a serious mental condition and by

13   cutting her off financially.

14         Additionally, Ms. Lockwood reported that Mr. Ma

15   believes his wife suffers from PTSD as a result of some family

16   event earlier on.

17         And defense counsel has submitted numerous letters of

18   support from Mr. Ma's family and friends, including a fellow

19   inmate from MCC and, of course, his own submission, Mr. Ma's

20   own submission.  The defendant's parents implore the Court to

21   have mercy on the defendant and to forgive him for his

22   "out-of-control anxiety during the severe pandemic, and forgive

23   him, also, for making ignorant and stupid decisions under the

24   special circumstances under great pressure."

25         Many of his family members affectionately refer to him

M4LKMUGS

1    as "Brother."  The defendant seems to have a large network of

2    friends and family who are shocked to hear about the offenses

3    committed by him.  They have stated that he would not make such

4    a mistake, that perhaps he did not understand the rules or the

5    laws in the United States, that it was an unintentional mistake

6    and not subjective wrong behavior.  He would not — this is

7    according to his family and friends — deliberately defraud,

8    something must have gone wrong.  He is described as

9    hard-working, disciplined, kind, compassionate, and generous.

10   Some individuals, including his mother, and his parents

11   jointly, wrote several letters on his behalf.

12        Defense counsel also submitted a series of photos of

13   the defendant, as well as a chronological history of

14   defendant's personal life as depicted in the photos.

15        Defense counsel describes the commission of these

16   offenses by the defendant as "a horrific, life-altering

17   decision, in a cataclysmically stupid and monumental, yet

18   temporary, lapse in judgment."  That's defense submission at

19   page 8.

20        The Court believes that his commission of the offenses

21   go beyond a temporary lapse of judgment.

22        Defense counsel also highlights the fact that others

23   who received PPP funds received sentences in the range of

24   24 months or less, and that the government "demanded a plea to

25   aggravated identity theft with a mandatory 24-month sentence

M4LKMUGS

1    precisely because Mr. Ma's withdrawal conduct would otherwise

2    be consistent with a probationary sentence."

3          So just so that it's clear, the identity theft is a

4    24-month period of incarceration, and it's consecutive to any

5    sentence that is given with respect to Count Two.

6          The Court presided over the guilty plea in this matter

7    and was not involved in plea negotiations at all with the

8    defendant.

9          Excuse me for one second.

10         (Pause)

11         THE COURT:  I was saying that I had presided over the

12   guilty plea in this matter, including taking of the allocution.

13   I was not involved in any plea negotiations at all with the

14   defendant.  But after conducting a full allocution, I accepted

15   the guilty plea as knowing and voluntary.

16         It is unclear what the defense counsel is pointing to

17   when stating that the government demanded a plea of aggravated

18   identity theft.  I'm assuming — but perhaps counsel can

19   enlighten me, both sides — that that was part of the

20   negotiation of the plea agreement.

21         Mr. Ma, even at the time of his plea allocution, had

22   every right to continue to plead not guilty and to have a trial

23   in this matter, and I concluded, and still believe, that Mr. Ma

24   knowingly and intelligently and voluntarily waived his right to

25   a trial, and pled guilty.  I'd be happy to hear from counsel on

M4LKMUGS

1    that subject, if they wish to be heard.

2           Just going back to the plea allocution:  We generally

3    allocute thoroughly and comprehensively and give defendants the

4    opportunity to back out, go to trial; they have every right to

5    a trial by jury.  So I continue to believe, as I said, that he

6    knowingly, intelligently, and voluntarily waived his right to a

7    trial, and pled guilty.

8           One question among many — and I include the entire

9    allocution here by reference as part of this record — one

10   question I know I asked him was:  Has anybody threatened you or

11   in any way forced you to plead guilty?

12          To which he responded:  No, your Honor.

13          And then I asked:  Including any attorneys?

14          And he responded:  No, your Honor.

15          Here are some other questions that were asked at the

16   plea allocution:

17          I said:  First of all, you understand that you have

18   the absolute right to plead not guilty if you wish?

19          And Mr. Ma answered:  Yes, your Honor.

20          Then I said:  Under the Constitution and laws of the

21   United States, if you were to plead not guilty, you would be

22   entitled to a speedy and public trial by a jury on the charges

23   set forth in the indictment.  Do you realize that?

24          He said:  Yes.

25          And I asked:  And if you decided to have a trial, at

M4LKMUGS

the trial, you would be presumed to be innocent, the government

would have to prove that you were guilty by competent evidence

and beyond a reasonable doubt with respect to the charges

contained in the indictment before you could be found guilty,

and a jury would have to agree unanimously that you were guilty

of the charges in the indictment, and you would not have to

prove that you were innocent.

And then I asked:  Do you understand those rights?

And he said:  Yes, I do, your Honor.

And then I inquired as follows:  And even now, I said,

at the plea, this afternoon, early afternoon, as you are

entering this guilty plea, you still have the right to change

your mind and to plead not guilty, and to go to trial on the

charges contained in the indictment.  Do you realize that?

And he responded:  Yes, I do, your Honor.

And then I asked:  But if you do plead guilty, and if

I accept the guilty plea, then you will be giving up your right

to have a trial and the other rights that I have been

discussing with you, and there will be no trial, but I will

still enter a judgment of guilty against you.  Do you

understand that?

And he answered:  Yes, I do, your Honor.

The plea was taken on June 15, 2021.  That's the date

of the transcript.  Among other pages, page 9, lines 14 through

25.

M4LKMUGS

1      So it was clear to the Court at the time of the plea

2   that Mr. Ma was fully competent and capable of entering an

3   informed plea, that he was aware of the nature of the charges

4   against him and the consequences of pleading guilty, and that

5   the plea of guilty was a knowing and voluntary plea supported

6   by an independent basis in fact, supporting each of the

7   essential elements of the two offenses, Counts Two and Eight, I

8   believe, to which he pled guilty, and I found, and I find

9   today, no basis to disturb those findings.

10      Mr. Ma, as I mentioned before, submitted a letter, a

11   quite lengthy one, to the Court, approximately 46 handwritten

12   page, which appears to be followed by a typewritten version,

13   clearly expressing his remorse and shame and embarrassment for

14   the commission of the two crimes.

15      In his letter, it was unclear to me whether he was

16   acknowledging the full scope of his offenses.  For example, on

17   page 11 of the handwritten letter, Mr. Ma states that his

18   incarceration "stripped off my 200-plus associates'

19   opportunities to work," and on page 16 of the handwritten

20   letter, Mr. Ma states, "Unequivocally, my 200-plus associates

21   are authentic."

22      He also apologizes profusely to members of his family,

23   and refers to himself as the golden child, a role model of

24   academic and career achievements for all.

25      By submission, dated April 13, 2022, the government

M4LKMUGS

1    requests the Court impose a guideline sentence of 42 months in

2    prison for Count Two, the bank fraud count, followed by

3    24 months consecutive for Count Eight, the aggravated identity

4    theft, for a total term of imprisonment of 66 months.  That's

5    found at the government's submission at page 2.

6              MR. RAVI:  Your Honor, I just want to confirm, that is

7    a request for a below-guideline sentence, not a guideline

8    sentence.  The guidelines on Count One is 51 to 63 months.

9              THE COURT:  Yes, I'm aware of that.

10             MR. RAVI:  Okay.

11             THE COURT:  I'm just looking at what I said.  I think

12   that's an accurate statement that I made.

13             MR. RAVI:  I thought you had referenced it as a

14   guideline sentence.

15             THE COURT:  I didn't say anything yet about the

16   guidelines — yet.

17             So I did say that the government requested there be a

18   below-guideline sentence of 42 months in prison for Count Two,

19   bank fraud, followed by a 24-month consecutive sentence for

20   Count Eight, which is the aggravated identity theft, for a

21   total term of imprisonment of 66 months.

22             Is that inaccurate?

23             MR. RAVI:  That is correct.  Thank you, your Honor.

24             THE COURT:  Yes.

25             So the government states that from the end of

M4LKMUGS

1    March 2020 through mid-May 2020, a period of approximately six

2    weeks, Mr. Ma applied to the SBA and six different banks for a

3    total of over $20 million in government-guaranteed loans for

4    two companies he owned, New York International Capital, which I

5    referred to several times earlier as NYIC, and Hurley Human

6    Resources.  He did that through the SBA's PPP and EIDL program.

7    In connection with these loan applications, Ma falsely

8    represented, among other things, that his companies together

9    had hundreds of employees and paid millions of dollars in wages

10   to those employees on a monthly basis.  In fact, however,

11   Mr. Ma appears to have been the only paid employee of his

12   companies since 2019.  That's a quote, that's the end of the

13   quote, the government submission, at page 3.

14         The government argues that defendant's crimes were

15   extremely serious.  I think everybody agrees to that.

16         The government states that defendant painstakingly

17   fabricated a multitude of documents to support his false

18   representations in the loan applications, which included bank

19   records, tax records, insurance records, payroll records, and

20   audited financial statements.  Moreover, he used the identities

21   of people he knew, including his wife and former girlfriend, to

22   submit fraudulent documents in connection with the loan

23   applications.

24         As probation determined, the defendant used these

25   identities to falsely portray his companies as legitimate

M4LKMUGS

1    companies with multiple employees in the same way that he used

2    his companies' websites to falsely portray them as global, even

3    though he was the only paid employee, page 14 of the

4    government's submission.

5          The government acknowledges that defendant withdrew

6    and canceled his loan applications prior to receiving any

7    money, but the government argues that the likely reason the

8    defendant withdrew and canceled his applications was because he

9    worried he was under investigation.

10         The government also argues that specific and general

11   deterrence are required in this case, as the only reason the

12   defendant committed the offenses was due to greed, and the

13   Court needs to send a message to others that such conduct has

14   severe consequences.

15         With regard to the two-year sentence sought by the

16   defense, the government states, "To that end, based on data

17   provided by the judiciary sentencing information tool provided

18   by the U.S. Sentencing Commission, the government notes that

19   during the last five fiscal years, from 2017 through 2021,

20   there were 51 defendants who had the same guideline range of 51

21   to 63 months as the defendant calculated under United States

22   Sentencing Guidelines Section 2B1.1 and who were convicted of

23   at least one count of aggravated identity theft.  Of those 51

24   defendants, the average length of imprisonment imposed was

25   63 months, and the median length of imprisonment imposed was

M4LKMUGS

1    64 months.  The government respectfully submits that the

2    defendant's request for a total sentence of two years is wholly

3    insufficient to achieve the purposes of sentencing."  That's

4    found at the government's submission at page 14.

5         I note that Mr. Ma has been in custody for

6    approximately 23 months already, since on or about May 21,

7    2020.

8         I've also received and reviewed the presentence

9    investigation report prepared on October 6, 2021, together with

10   the addendum and the sentencing recommendation, dated

11   November 3, 2021.  I also have the correspondence, dated

12   April 4, from defense counsel, Peter Katz, which included,

13   among other things, the forensic evaluation, dated April 2,

14   from Leslie Lockwood, and correspondence, dated April 12, 2022,

15   from the Assistant U.S. Attorney.

16        So at this time, I would ask Mr. Katz and Mr. Ma if

17   they had the opportunity to read and discuss the presentence

18   investigation report along with the addendum and sentencing

19   recommendation?

20             MR. KATZ:  We have, your Honor.

21             THE COURT:  Mr. Ma, you went over that presentence

22   report with counsel?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  And you read it together, I suppose, and

25   discussed it with Mr. Katz; is that fair to say?

M4LKMUGS

1          MR. KATZ:  Yes, Judge, we reviewed it extensively.

2          THE COURT:  Mr. Ma, is that fair to say?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Do either of you have any remaining

5     objections at this point with the presentence report?

6          MR. KATZ:  Your Honor, we submitted our objections,

7     and we maintain those objections, but other than those, there

8     are no additional ones.

9          THE COURT:  Okay.

10          And, Mr. Ma, any additional objections from you?

11          THE DEFENDANT:  I'm on the same page with my counsel.

12     Thank you, your Honor.

13          THE COURT:  You bet.

14          How about the government, do you have any objections?

15          MR. RAVI:  No, your Honor.

16          THE COURT:  So I will return the presentence report to

17     probation, which is our practice.  And I'm happy, at this time,

18     to hear from defense counsel and from Mr. Ma and from

19     government counsel.

20          MR. KATZ:  Thank you, your Honor.  May I take my mask

21     off?

22          THE COURT:  Yes, you can.  Sure.

23          MR. KATZ:  Thank you.  Thank you for the opportunity,

24     Judge.

25          I want to say, you've reviewed the record quite

M4LKMUGS

1    clearly.  There are a couple of things I'd like to, I think,

2    clarify at your Honor's request and some other things that came

3    up and also talk generally about Mr. Ma, about his offenses,

4    and about punishment that we're here about today.

5          First, Judge, I think Mr. Ma is a good person who

6    made, as I wrote and you read, a cataclysmically stupid

7    decision without question.  He doesn't deny that.  He came, and

8    he pled, and he accepted his responsibility, and, as I

9    mentioned -- and I will talk about it in a second -- he did so

10   very early on, I think earlier than anyone else who has been

11   convicted of a PPP fraud case.

12         But as you can see from the dozens of letters in

13   support of Mr. Ma, it's hard to confine him to this one event

14   in his life.  The government — they're advocates, and they're

15   going to do that — they're going to focus on the bad thing that

16   he did, and, no question, it was bad.  But he's much more than

17   just that one thing.  He's 38 years old.  He's lived a very

18   full life, and he's done a lot of good things — many, many good

19   things — in his life as well, and as your Honor referenced,

20   under 3553(a), you should take those things into account, the

21   history and characteristics of the person, not just of the

22   crime.  And I think that the letters that you received, the

23   mitigation submission from Ms. Lockwood, from my submission

24   that you see, you should see Mr. Ma as much more than just this

25   offense.

M4LKMUGS

1              This was -- to use the kind of phrase that we used to

2     use when the guidelines were mandatory, this was aberrant

3     behavior, this is not consistent with the rest of his life.

4     And you may ask, well, how is that possible, how does that

5     happen?  People make mistakes.  This was a terrible mistake.

6     He has paid for it already, and he will continue to regardless

7     of your sentence.  The collateral consequences of his conduct

8     will follow him for the rest of his life, and that is something

9     he will have to deal with, without doubt.

10             But it's also important, I think, to pay attention to

11    how he handled this once he came to the realization that this

12    was a terrible crime and terrible mistake that he had made.

13    Again, unlike anyone else who's been prosecuted -- there have

14    been hundreds of people prosecuted for PPP fraud in this

15    country.  I have reviewed as many as I could find — I can't say

16    it's every one because I don't know for sure — but hundreds of

17    them.  Not one other person withdrew or canceled their

18    application.  He's the only one who did that.  The government

19    says, well, it's only because the banks had found out about

20    what had happened.  They haven't submitted any evidence to

21    indicate that Mr. Ma knew that the bank had frozen the funds or

22    conducted any kind of investigation.

23             And I reference this with regard to the guidelines,

24    and I'll talk more about them in just a second, if I may, but,

25    for purposes here, it's really interesting the way the

M4LKMUGS

guidelines work under 2B1.1.  When you look at the intended

loss, we agree that the intended loss here was about

$6.9 million, because that was the value of some of the

applications, right?  But the guidelines here are very -- I

don't want to say malleable, that's probably not the right

word, but very binary, either it is or it isn't, and, in this

case, there is a commentary in the advisory notes that indicate

that if someone withdraws their application for a loan, as this

was, then you reduce the amount of the loss by the amount that

they've withdrawn.  Here, it would be 100 percent.  He

withdrew, and there's no doubt that he withdrew all of his

applications.

         And so, in that instance, the guidelines would then

revert back to zero loss, which would be a zero to six from a

guideline calculation standpoint.  But because the advisory

note says that if a victim identified the fraud before he

submits the withdrawal, you don't do that subtraction, right,

and it is true that they identified it, but that doesn't speak

to what was inside Mr. Ma's head.  There is no evidence — the

government has not presented any evidence — that Mr. Ma did, in

fact, know that he was under investigation or that the bank had

identified the fraud.  The facts are that they had, and that's

why we can't argue, from a guideline perspective, that the

guidelines are incorrect.  But it's precisely why, I think, the

guidelines in this case are really -- I don't want to say

M4LKMUGS

1    irrelevant, because you must look at them, but they're really

2    wholly inappropriate in this case because of the unique nature

3    of the circumstances and the facts of what happened.

4            When you look at the characteristics of Mr. Ma, you

5    should take into account that he did withdraw, and that nobody

6    else had.  No one else who had done this withdrew their

7    applications.

8            There is no restitution in this case.  In almost every

9    other case that I reviewed, people received millions of dollars

10   in PPP funds, and they didn't put it into their company, they

11   spent it — they bought cars, they bought houses, they bought

12   mink coats, all kinds of personal items — and did actually take

13   money and spend it that could have been used for other people

14   who really did need it.

15           Mr. Ma realized his mistake, and he corrected it early

16   on, not just at his plea.  And I will tell you that in every

17   interaction that I have had with him, he has been —- I've been

18   in criminal justice for 27 years.  I was a prosecutor for 17.

19   He is, if not the, one of the most remorseful people that I

20   have met for his conduct.  Every time I talk to him, he talks

21   about how sorry he is for what happened.  And I hope that that

22   came across in our written submissions and from his letter.

23           I know your Honor referenced one point about his

24   associates, and I will tell you that the use of that word was

25   intentional, not employees.  As you referenced, English is not

M4LKMUGS

1    Mr. Ma's first language, and I think the term "employee" is
2    also a very technical one, even though it's a generic term, and
3    it's true there were not people who were receiving W-2s and
4    employed by his two companies.  However — and I think the
5    government has acknowledged this, at least in my conversations
6    with AUSA Ravi — that there were many other people who did do
7    work for Mr. Ma under NYIC and Hurley, and they were
8    independent contractors, they were interns, but there were
9    people.  This was not a fake company, this was not something
10   that was made up out of whole cloth.  Should he have submitted
11   the applications?  Of course not.  But these were real
12   companies, and there are real people who he references as the
13   200 people.  This is not a fantasy or a fabrication.  They are
14   real, and they have been identified.  So I think that's just to
15   answer your Honor's point about that.

16         THE COURT:  Counsel, do I understand, from what you've
17   said so far, that you are suggesting there should be a zero
18   months attributable to Count Two, but 24 months would be
19   attributed to the identity theft, the consecutive count?

20         MR. KATZ:  Yes, your Honor.  That was in our
21   submission as well.  Because of the way -- and I'll talk about
22   it some more, but just from a guideline perspective, granted,
23   the guidelines are, we believe, accurate, but inappropriate.
24   If you kind of made that one adjustment, the guidelines would
25   put him at a zero to six, and we believe that that, in the

M4LKMUGS

1    reality under all the 3553(a) factors, is appropriate here, and

2    I will talk about some of the other reasons in a minute, but,

3    yes, on Count Two, effectively time served, or zero months, a

4    probationary sentence.  I understand, technically, it wouldn't

5    be probation because he's going to receive 24 months on the

6    aggravated identity theft, but a collective 24 months.

7              THE COURT:  It would be zero?

8              MR. KATZ:  Correct.  Or time served, either one,

9    however your Honor wishes to fashion it.

10             And I will talk about why, in addition, some other

11   reasons as well now.

12             You also referenced, your Honor, the guidelines having

13   been mandatory for a period and advisory since about 2005,

14   2006 -- or 2004, sorry, and 2006.  In January of 2006, it fully

15   switched.  It's interesting that the guidelines have now been

16   advisory for as long as they were mandatory — we're just about

17   at that tipping point — and yet -- and nothing against AUSA

18   Ravi, my relationship has been good and he's been totally, I

19   think, reasonable in his position representing the government,

20   but it seems to me that the government is still in a place

21   where the guidelines are the primary basis of their

22   recommendation.  And I will say, again to his credit, in my

23   experience, having been in the government, and now as a defense

24   attorney for the last ten years or so, it's very rare for the

25   government to recommend anything other than a guideline

M4LKMUGS

1     sentence.  It is the — I'll use the colloquial phrase — the

2     knee-jerk reaction, if the guidelines say it, that's what the

3     sentence should be.

4          Here, I appreciate that AUSA Ravi has not recommended

5     that, that he's recommended a below-guideline sentence, and I

6     think to your Honor, that's a significant indication that this

7     crime is different than the typical crime, and I'll talk now

8     about what is a similarly situated defendant.

9          The government, in their papers, indicate, well, it's

10    anyone who has a guideline sentence of 51 to 63 months and an

11    aggravated identity theft conviction.  Judge, those are not

12    similarly situated defendants.  We didn't see anything about

13    them; those cases could be totally different.  2B1.1 is the

14    catchall of all catchalls, aside from drug offenses, in the

15    guidelines.  They have nothing to do with Mr. Ma whatsoever.

16    What cases do?  Cases that involve submissions of PPP and EIDL

17    loans to the government, and those are the cases that we cited.

18    Those are specifically the cases that are relevant here, that

19    are similar to him, as close as you can get, right, with one

20    important distinction I mentioned before — he withdrew his

21    application.  He has effectively zero restitution.  Whether

22    it's a zero guideline or not, it's zero restitution.  Those

23    other cases do not.  People got millions and millions of

24    dollars.  We referenced, I believe, 20 or 22 different cases

25    where defendants received significant amounts of money and

M4LKMUGS

1    still received a sentence of 24 months for their conduct.

2              I'll talk now about the aggravated identity theft.

3              THE COURT:  Were those Southern District cases?  I

4    couldn't tell.

5              MR. KATZ:  I don't remember if there are any Southern

6    District cases in there.  I don't believe there were.  I don't

7    believe there were any in that grouping.

8              Judge, with regard to the aggravated identity theft:

9    Your Honor just detailed the plea.  There's no question he pled

10   guilty to it.  That wasn't -- if that's the way your Honor took

11   it, that we were somehow withdrawing our --

12             THE COURT:  No, no, no.

13             MR. KATZ:  -- acceptance, that's not what we mean at

14   all.

15             THE COURT:  I just wanted to make clear and close

16   any -- whether there were any issues that were open or not, I

17   just wanted to make sure that it was clear, and that it's

18   important to me that, particularly since I took the plea, that

19   I understood at the time that it was knowing and intelligent

20   and voluntary and all that, because I would personally feel bad

21   if someone didn't do it under those circumstances.

22             MR. KATZ:  Understood.  And we're not withdrawing the

23   plea, we're not saying it wasn't voluntary.

24             The purpose of mentioning that in our submission was

25   because it was involved in plea negotiations, right?  And

M4LKMUGS

1    because aggravated identity theft -- let me step back for a

2    second.

3           Mr. Ma was indicted on three counts of aggravated

4    identity theft.  And from a technical standpoint, we agree that

5    his conduct falls within the scope of the statutory language

6    and the case law that has followed it here in the Second

7    Circuit.  I may have a difference of opinion about that, but

8    that is the case law.  And so we had long discussions about

9    what that meant.  I had many conversations with AUSA Ravi about

10   not just the significance of a plea, but whether that was

11   necessary or appropriate in this case.  And it was the

12   government's position that if Mr. Ma wanted to plead guilty to

13   a plea agreement with the government, that he would have to

14   plead guilty to one count of aggravated identity theft in

15   addition to the bank fraud count.

16          He was facing three counts, and that would have been

17   six years consecutive to something else.  So, yes, he could

18   have gone to trial, but that obviously exposed him to the

19   potential for a much longer sentence.  And so we made the

20   decision that that was an appropriate move for Mr. Ma, it was

21   in his best interests.

22          That said, I think it is relevant and important for

23   your Honor to look at what the actual conduct was with regard

24   to the aggravated identity theft here, and to put it in context

25   with all the other PPP fraud cases that have come down the pike

M4LKMUGS

1    over the last two years.

2              With regard to the latter, again, by my review of

3    hundreds of convictions and sentences, Mr. Ma is the only

4    person in the country who actually pled guilty to aggravated

5    identity theft in addition to an underlying bank fraud.  And in

6    this context — now I didn't review the record of every single

7    one of those cases to see if this is true, but I think

8    logically it follows — if you submitted a PPP loan application,

9    one of the things you had to do was reference employees or

10   other employees, and you would have to use somebody's name in

11   that fraudulent application, and, therefore, anybody who

12   submitted a false application for a PPP loan, de facto, was

13   also guilty of aggravated identity theft.  By that, I mean

14   anybody who --

15             THE COURT:  I don't know about the de facto.  That's

16   your surmise.

17             MR. KATZ:  Of course.  But if you think about it, and

18   the way that the statute is written, the use of someone else's

19   name during a fraudulent submission for a loan application is,

20   by definition, aggravated identity theft.  And it's not to say

21   that Mr. Ma didn't do that, it's to say that he has been

22   treated, for whatever reason, differently than every other

23   person who has been charged by the same government in these

24   types of cases.  And we accepted that, we felt it was in his

25   best interests, but it is also, I think, something your Honor

M4LKMUGS

1    can and should take into account, that nobody else was -- and

2    you used the word, and I think the word I used was -- remanded

3    by the government, in plea negotiations, that he plead guilty

4    to that.  So I think that that's relevant to consider in

5    determining where he falls within the scope of all the people

6    who have committed these offenses.

7              And I think it's also important to look at --

8              THE COURT:  Just on that latter point, that's

9    certainly not something I can take into account.  I mean, I

10   don't know.  You have all these other cases, and they don't

11   have an identity theft count in the plea, so if they don't have

12   it, they don't have it.  I can't really surmise either what

13   they were thinking or --

14             MR. KATZ:  I'm sorry, that who was thinking?

15             THE COURT:  The people who signed the plea agreements.

16             MR. KATZ:  Oh, I understand, but they all involved --

17   well, every one that we cited anyway and all the other ones --

18   almost all the other ones are pleas.  They all pled guilty --

19             THE COURT:  I think what you're saying is — and I will

20   accept that as fact, you've done the research — that you didn't

21   find any other cases that have two counts in the plea

22   agreement, one of which was an aggravated identity theft.  That

23   was really the only --

24             MR. KATZ:  Correct.

25             THE COURT:  -- 100 percent surmise I can --

M4LKMUGS

1          MR. KATZ:  Correct, correct.

2          But, also, I think it's -- look, it's going to be

3     24 months on that count — there's no debate about that.

4          THE COURT:  Yes, I get it.

5          MR. KATZ:  None of us can change any of that, but I

6     think it is also, for the purposes of 3553(a), important to

7     think, and for your Honor to know, what that conduct actually

8     was.  Aggravated identity theft sounds significant, and it is,

9     but, typically, we think about stealing someone's credit,

10    identity, and going and committing some other offense.  Here,

11    what happened was Mr. Ma submitted the applications with his

12    name.  He's the one who signed the applications for all of

13    these loans.  In some correspondence with the banks, he used a

14    work email that had been legitimately set up for other people

15    to communicate back with the banks.  And in those emails --

16    now, my research tells me that an email is not identity -- an

17    identity for purposes of the statute, but someone's name is.

18    And because, in those emails, it actually listed that person's

19    name and indicated that or referenced that that email was

20    coming from that person, in discussions with the bank about the

21    applications, that qualifies as aggravated identity theft.

22          I think that is, while, again, technically violative

23    of the statute, not the typical conduct that we see with regard

24    to someone who has committed or has been prosecuted in this

25    district and elsewhere for aggravated identity theft, just to

M4LKMUGS

1    put it in a frame of reference for your Honor.

2          I'd like to make one other comment about the

3    government's submission.  You referenced that they said that

4    the defense request was not only inappropriate, they also used

5    the term "unlawful."  I think it's important for your Honor to

6    know, and I think that that is not true.  It is a totally

7    lawful sentence for you to sentence Mr. Ma to 24 months.  He

8    would get 24 months on Count Eight, the aggravated identity

9    theft, and zero months on Count Two, the bank fraud.

10         THE COURT:  Yes, it probably is true, but just if you

11   want to know my candid reaction to that, it would be the tail

12   wagging the dog, in my opinion.

13         MR. KATZ:  Look, you're the Judge.  You have to make

14   the decision.  I'm going to make the arguments that I think --

15         THE COURT:  It just would seem a little odd to me.

16         MR. KATZ:  It would seem odd, but I think this case is

17   a little odd as well, given some of the factors that I'm

18   referencing.

19         If I can now talk a little bit about punishment and

20   the purposes of 3553(a) for Mr. Ma.  And we've referenced this,

21   I'm not going to go through all the reasons that we put in our

22   papers, and I appreciate your Honor's recitation, and I know we

23   submitted a lot more than typical, and I gave great thought to

24   actually do that because I know it was a lot for your Honor to

25   read.  I thought it was appropriate here so you really could

M4LKMUGS

1    get a flavor for Mr. Ma and his station in life.

2              THE COURT:  I thought it was all valuable.  I've had

3    one other case that I can recall vividly that had -- not a case

4    like this, but it involved sanctions, where there was a similar

5    kind of submission, with business associates, family, friends,

6    and explanation, and I thought in that case, it was very

7    helpful, and this case as well.

8              MR. KATZ:  I'm glad, your Honor.

9              I just want to say, with regard to punishment, what is

10   the purpose, what are we doing here?  Again, I'll go back to

11   the government's position, and I think, again, nothing against

12   AUSA Ravi — as I said, I've sat in his seat — it's very hard to

13   know what the punishment actually is when somebody is sitting

14   in jail, particularly when those jails are the MCC and MDC here

15   in New York.  I didn't realize this until I became a defense

16   attorney.  They are draconian.  The punishment is severe, and I

17   don't use those words lightly.  I mean, I was shocked because I

18   did not realize this during my 17 years as a prosecutor.  The

19   conditions -- MCC, while Mr. Ma was there, was closed down.

20   That's, I think, unprecedented.  They were terrible, and they

21   were terrible in a terrible time, during COVID.

22             Mr. Ma contracted COVID while he was in jail.  He

23   suffered many other -- the lockdowns, the inability to

24   communicate, our difficulties communicating, all of these

25   things were very serious punishment.  And if you think, okay,

M4LKMUGS

1    one of the purposes of sentencing is deterrence, the time that

2    he has spent there already, anybody who did that would not want

3    to go back.  And I know Mr. Ma does not want to go back.  He is

4    remorseful, but he also understands the conditions that he was

5    subject to and would never go back to those conditions.

6            So I think it's really important to think about that

7    in this case.  It's not just kind of a passing glance, oh, he's

8    been incarcerated, it was the MCC, it was COVID.  They are very

9    real, and something I think your Honor should not take lightly

10   in weighing all of the factors.  I think that's an important

11   factor.

12           I think, also, looking at similarly situated

13   defendants is also important in this case, and I think the

14   way -- quite candidly, I think the way we referenced it is much

15   closer to reality than the government.  I think the

16   government's doing some guidelines gymnastics in trying to come

17   up with a 63/64 months as a median whatever.  They are facts,

18   but I don't think they are really relevant here, as I described

19   before.  I think if your Honor is looking at, okay, what have

20   other judges who have sat in your position done with other

21   similarly situated defendants, maybe worse defendants, in the

22   term of the crime they committed because they actually received

23   money and spent the money, and many of them got 24 months.

24           THE COURT:  Are any of those Eastern District cases

25   that you cited?  You said you didn't know if any S.D.N.Y. --

M4LKMUGS

1           MR. KATZ:  I don't believe there were any New York

2       cases in those.

3           THE COURT:  At all?

4           MR. KATZ:  Honestly, I don't remember — and I could be

5       wrong — remember seeing any Eastern District cases that have

6       already been sentenced.  I think there have only been a couple

7       S.D.N.Y. sentences as well, but I'm not sure.

8           I think if you look at all of these factors, Mr. Ma's

9       history, the difficulty he had growing up, and his parents'

10      situation — that's something I haven't referenced, which I know

11      were in the papers and your Honor talked about — his parents

12      came to the U.S. and have been here -- they're Chinese, they

13      don't speak much English, they've been living here for two

14      years to support him emotionally and psychologically.  They

15      both suffered significantly, and, in fact, I learned, I think,

16      even after our submission, Mr. Ma's father, who is here, even

17      though he was advised not to come because of his physical

18      condition.  He broke his hip on his way to go visit Mr. Ma and,

19      in fact, had very serious effects in the hospital in the

20      emergency room where he almost died.

21          Of course, Mr. Ma has to be punished for his conduct,

22      but he also is an only child in a Chinese family where it is

23      the culture and his belief he needs to take care of his

24      parents.  And, in this case, he really does need to take care

25      of his parents.  They are ailing, they are frail, and they're

M4LKMUGS

1  in a country they don't know anything about, and I think that

2  that's something your Honor can and should take into account as

3  well.

4            Sometimes I think in this process, we use the numbers

5  as currency — how long someone goes to jail becomes like money,

6  okay, it's this amount.  I think here, your Honor, I really

7  think you need to look at all of the factors, you need to look

8  at all of the aspects of Mr. Ma, of the crime, of his

9  withdrawal, of his remorse, of his family condition, of his

10  incarceration thus far, in fashioning a sentence that is

11  sufficient, but no greater than necessary, and not just based

12  on numbers.  I think this is an unusual case because of all

13  those factors, and that's why our recommendation and our

14  request is for, granted, an unusual request, but I think it's

15  appropriate here.  I don't think people in the public who saw

16  this, who read this record, who see what happened, saw what

17  happened in this case would think that that was an unfair

18  sentence, that somehow Mr. Ma got away with it.  I don't think

19  that that's how the public would look at it.  I don't think --

20  I certainly know that's not how Mr. Ma looks at it, and I don't

21  think your Honor should look at it that way either.

22            I appreciate your time.  Thank you.

23            THE COURT:  Okay.

24            Mr. Ma, do you wish to be heard?

25            THE DEFENDANT:  Yes.  Thank you for the opportunity,

M4LKMUGS

1    your Honor.  May I ask a quick question?

2              THE COURT:  Yes.

3              THE DEFENDANT:  To my counsel?

4              THE COURT:  Sure, absolutely.

5              THE DEFENDANT:  Thank you.

6              (Defendant and counsel confer)

7              THE DEFENDANT:  Sorry, your Honor.

8              THE COURT:  That's all right.  Take as much time as

9    you need.

10             (Defendant and counsel confer)

11             THE DEFENDANT:  Excuse me, your Honor.  Thank you for

12   the time.  And I think I'm ready to speak.

13             THE COURT:  My pleasure.  I'm happy to hear you.

14             THE DEFENDANT:  Again, very guilty, very guilty.  It

15   was me who filed in those false applications, with false

16   documents, and I must take a hundred percent responsibility for

17   it.  Not only I'm ashamed, but, also, I will put it this way,

18   it's an immense ignominy on me and my family.

19             I absolutely know any excuse, not for this, not only

20   my stupidity, but, also, again, putting it this way, something

21   much stronger — it's ludicrous, ridiculous, laughable, folly

22   and lunacy, insanity, stupidity.

23             So my applications disturbed the government's pandemic

24   relief efforts made to our country.  That is why I hate, I

25   detest myself so much, because, in fact, very honestly, so

1   much, too, I love this country, I love America, that many

2   immigrants here actually see America as home, but I see it as

3   my tomb.  I know I will die here in my tomb, and, if necessary,

4   I will die for America.  But before that, I now clearly know

5   that my best way to love America is to actually meticulously

6   abide by law and order.

7       Therefore, I just say, today, what I really want to

8   enunciate is for my very awful wrongdoing, including everything

9   that you just mentioned, your Honor.  So I'm very, very sorry

10   to my country, America, and I'm very, very sorry to you, your

11   Honor, to the court, everybody here, to the government, to the

12   banks, and to all those my fellow small business owners and

13   their employees, and to all those associates who used to work

14   at my company before, at my two companies, NYIC and Hurley, as

15   all of them.

16       I'm also sorry to my clients, both here — domestic —

17   and overseas.  And I am so, so sorry to my elder parents, who

18   are sitting behind me.  I failed them.  I failed them as a son,

19   and I have to fulfill that.  And I'm also very, very sorry to

20   my wife, my former girlfriend, my great family.

21       Your Honor just mentioned that I didn't mention in my

22   letter that I'm a golden child, but what I mean here is I

23   failed them.  So as an example, for so many years, I failed

24   them now in the future.  As I said in the letter, I will tell

25   everybody that, so to perfectly abide all the laws on a very

M4LKMUGS

1  minimum for all benefits in this country, that we have to

2  fulfill perfectly.

3       I also have to say sorry to all my friends, including

4  my coach, sitting behind me, and my very close friend sitting

5  next to my coach.  I actually now feel very, very shameful.  I

6  feel like I'm too abominable to turn around to see either my

7  parents or my coach and my friends because what I did was

8  totally opposite to what all they have been teaching me for so

9  many years.

10      So, in fact, I'm so sorry to everybody in our society.

11  That's how I'm feeling now today.

12      Unequivocally, I just say unequivocally, a steep price

13  was paid by my companies and by my family and by myself,

14  clearly.  To be accurate, especially the MCC and MDC, they are

15  literally sordid.

16      THE COURT:  They are?

17      THE DEFENDANT:  Sordid, like dirty, harsh, draconian,

18  and extremely cruel and -- yeah, you get the idea, your Honor.

19  I value your time.

20      It's like many people are saying, that it's like two

21  pungent armpits of our lady Statue of Liberty, because many of

22  us can see the lady Statue of Liberty from the yard, so it is

23  truly harsh.  But that's the hard way.  The real is how we

24  think of it, actually, the real part of her soul was those

25  literally months after months, almost years after years, of the

M4LKMUGS

1    extenuated, virtually 24/7 lockdowns, and that's very unusual.

2

3          And then I got COVID.  And then I got malnutrition

4    diagnosed by the medical team.  During my COVID, 24 --

5    virtually 24/7 lockdowns, isolation, COVID isolation.  I was in

6    the COVID isolation unit.  No any medication was given during

7    that entire time in the COVID isolation.  And, actually, for

8    years, I been enduring, actually, I have to say, the rampant

9    corruptions in the BOP and the raging anti-Asian crimes in

10   recent years against we Asians, especially in the jails,

11   committed by some very violent gangs, such as those murder and

12   even Mexican gangs like MS-13.  I'm not complaining here, but

13   the reality is the past 23 months, up to 24 months, or about

14   690 or up to 700 long days were indeed extraordinarily cruel,

15   inhumane, and truly extremely tormenting, especially mentally

16   tormenting.

17         But I really feel like whenever I introspect those

18   extremely harsh times, I love it.  I have to really say I love

19   it.  I love those extremely harsh times.  Under today, a friend

20   of the government, I truly sincerely appreciate the government.

21   Regardless of this unusually harsh punishment, I truly

22   appreciate the government.  The reason is -- with my whole

23   heart.  The reason is, while I was being isolated 24/7,

24   especially when I was literally paralyzed by COVID for those

25   weeks, my mind was still active.  I was introspecting in very

M4LKMUGS

1     depth, every single day, from the very early morning to the end

2     of the day.

3             I literally achieved a highly potent catharsis, a

4     purification of my characters and my soul by literally talking

5     over and over again to myself.  Indeed, it was -- yes, it was

6     out of my truly astronomical guilt that I was feeling, and

7     intensifying, consolidating, almost every minute back then in

8     2020, just like a -- like a black hole, like sucking me inside,

9     and soaking me up into this kind of, like, a higher feeling of

10    a highly abysmal shame, dishonor, and I truly felt the

11    excruciating distress for filing those false applications, that

12    I canceled all of them.

13            I told myself over and over again that it doesn't

14    matter how long I canceled all of them at all.  It doesn't

15    matter how early I canceled all those applications.  It doesn't

16    matter either how much rehabilitation work you just mentioned,

17    your Honor, thereafter or even in the future I plan to do.  It

18    really doesn't matter anything.

19            So I shouldn't have even started whatsoever at the

20    very, very early beginning.  And especially during the 24/7

21    isolation during COVID infection, I also repeated to myself, I

22    swear I would never, ever, do anything wrong anymore.  But not

23    only that, I would never, ever do anything immoral anymore.

24            So far, I've been doing well because I absolutely have

25    zero ticket in both MCC and MDC over the 23 up to 24 months,

M4LKMUGS

1   zero, because in these two jails, even if you put a book on a

2   bunk or you forget to wear a uniform in the unit, so you got to

3   take eye contact zero.  That's why I want to say, actually, my

4   friends, my family, and actually the whole world from here

5   overseas know that, one, Hummer — me — Hummer Mars, they know

6   me, is committed to something, he can always get it done, and

7   that's my standard.

8          So today, your Honor, I'm actually so confident to

9   promise you, your Honor, today under oath in the Court, you

10  will never, ever see me here like this, like in the shame,

11  anymore.

12         And I will precisely produce a purified — that's my

13  standard — purified, while very, very humble person to show to

14  you at our very first court-involved supervised release

15  hearing, you will have -- if I have the luck to meet you again,

16  you will see that.  And today, this very allocution must be

17  together with my very in-depth introspection every day back in

18  my COVID 24/7 isolation, will be repeated, just like before,

19  and in the wee hours of every early morning of every single

20  day, for my entire life, to make sure I can live, infallibly

21  and humbly, I say perfectly law-abiding and morally purified

22  resident of our country for the rest of my life, definitely

23  holding with my highly profound and intense remorse, sorrow,

24  pain for doing all this wrong, for the entire life, forever,

25  the rest of my life.

M4LKMUGS

1          And, once again, my most heart-to-heart apologies to

2    you, to all the country, everybody in our society.  I am so, so

3    very sorry, very sorry.  And never again...

4          THE COURT:  You know, Mr. Ma, I don't have any doubt

5    about how sorry you are.  The whole matter is a tragic one.

6    And I know, from the first line in your letter, that you are

7    remorseful and apologetic.

8          I have a suggestion.  I don't know if you will

9    appreciate it or not, but I think — this is just a personal

10   opinion — that you would do better, in a sense, to start

11   looking forward at what comes next for you, and how you can be

12   successful, and how you can reengage with your family and

13   friends.  Again, this is just a personal opinion, but you don't

14   have to keep beating yourself on your chest or on your head or

15   in letters about what's happened in the past.

16         Yep, it was a tragedy, a mistake, whatever, but,

17   certainly, from my point of view, I am not seeking blood from

18   you or any of that angst.  I know that you are apologetic, I

19   know that you are sorry, I know that you wish you could take it

20   back.  I get it.

21         I think that, though, you would do yourself a favor,

22   as I say, if you could now try and put it behind you and focus

23   on how -- you're a young guy — focus on how you can be

24   successful going forward.  If there are programs at MCC --

25   you're going to be designated to a facility.  Hopefully, they

M4LKMUGS

1    will have programs.  Hopefully, they'll have mental health

2    assistance.  I hope you will be able to put it behind you, in a

3    sense, so that you can focus on how you can be successful, as I

4    say, going forward.

5              That is the way to end this angst and tragic deep-felt

6    remorse and guilt and all of that.  I get it, I get it, I know

7    you're terribly sorry.  Start to look forward and see how you

8    can, in a positive way -- you've had some great experiences in

9    your educational career and in your work.  You have lots of

10   good qualities, and you will be able to be successful, I

11   believe, again.  Maybe not exactly in the same kind of work

12   that you did before.  But that's what you should be starting to

13   do, if you can, like reading and talking to other people about

14   what opportunities are out there for you.

15             It may seem like it, but in your case, I don't think

16   it's the end of the world.  I think you have a lot of strengths

17   and capabilities, and I think you will be able to see some

18   positives here and at least in the rest of your life, which you

19   have a long time ahead of you to become successful again.

20             So I get it, I know you're remorseful.  I'm past that.

21   I think the goal here now is to have the sentence and you be

22   able to go through it in a positive way and then come out on

23   the other end in supervised release to begin with, and start to

24   have some positive experiences.

25             I know you've had a tough time in the MDC, and had an

M4LKMUGS

1    even tougher time you've imposed on yourself.  I think that's

2    true, also.  So that's just a thought.

3             THE DEFENDANT:  Thank you, your Honor.

4             THE COURT:  Yes.

5             THE DEFENDANT:  I will keep everything in my mind, and

6    I do appreciate that.  Thank you.

7             THE COURT:  You bet.

8             Ms. Lockwood, did you want to be heard?

9             MS. LOCKWOOD:  Briefly, just briefly.

10            Before working as a mitigation specialist, I was a

11   supervisor in probation, Eastern District, in the same place as

12   his attorney.  And, honestly, I have never met a defendant who

13   is not only as remorseful as Mr. Ma, but somebody who just, as

14   you mentioned, thinks all the time about how he's going to

15   improve himself.  He's been taking classes at Columbia

16   University while at the MDC, and the whole goal of that is so

17   that he would be more marketable when he gets out.  We were not

18   allowed to see him or communicate with him during certain hours

19   on Thursdays because we knew he was in class.  I've never had

20   anybody say that to me before.

21            His communication with us was overwhelming.  You

22   mentioned that he may have obsessive compulsive disorder.  I

23   fully agree with that.  If you look at the entirety of his life

24   and the number of times he's communicated with -- sometimes I

25   would get an email from him five times in five minutes.  It was

M4LKMUGS

1    compulsive.  And I think filling out the applications may also

2    have been compulsive.  He just can't stop himself.

3         He was speaking very slowly and articulately today,

4    but he can sometimes just speak so quickly because he wants to

5    get so much in, he doesn't want to waste a single moment, and I

6    feel like -- I know you're suggesting that a sentence of zero

7    months on Count Two and two years on Count Eight -- I may have

8    screwed them up, I'm sorry.

9              THE COURT:  That's fine.

10             MS. LOCKWOOD:  The tail wagging the dog.

11             THE COURT:  Yes, that's what I said.

12             MS. LOCKWOOD:  I think it's unfortunate that we don't

13   have statistics from Eastern District and Southern District,

14   because, in my experience, in Eastern District — I can't speak

15   for Southern — is that -- in fact, nationwide, Eastern District

16   was always extremely lenient when it came to fraud sentencings.

17   So, in my experience, I was there during Superstorm Sandy,

18   people weren't getting jail time after Superstorm Sandy.  They

19   were doing the same kind of things — they were applying for

20   grants and loans.  I was actually one of those people applying

21   for a loan, an SBA loan, but in Eastern District, they were

22   getting months, not years.

23        So the fact that we don't have statistics from

24   S.D.N.Y. and E.D.N.Y. is so unfortunate, because for him to

25   spend more than he's already spent is just unbearable.

1          I used to be the liaison from probation to the MDC.

2     I've always had an excellent relationship with them.  I've

3     taken judges on tours of the MDC; I've taken lawyers on tours

4     of the MDC.  Historically, in the past, the place was

5     immaculate.  Not always above reproach, you know, things

6     happened.  But now, I have many clients that have been at the

7     MDC, and the circumstances there are so harsh, there have been

8     times when they're only allowed out for minutes on a given day.

9     That's akin to being in solitary confinement.  So I know Mr. Ma

10    is talking about his COVID restrictions, but that's on top of

11    what was already in place.

12         There was an attack in Texas, in Beaumont, and there

13    was a lockdown nationwide, where nobody could leave their cells

14    for weeks.  There was no communication with families, there was

15    no communication with lawyers.  Nobody knew what was going on.

16         So even though he's only been incarcerated for

17    23 months, it really equates to a lot more than that because of

18    the extremely harsh conditions he's endured.

19         I was in probation when they had a blackout at the

20    MDC, and when they had the blackout at the MDC, we thought that

21    was horrific.  We thought that was the worst thing that could

22    have happened, you know.  But that was a two-week period of

23    time where it was chilly, and I went and investigated on behalf

24    of Judge Dearie.  That was nothing compared to what they've

25    gone through for this extended period of time, which Mr. Ma has

M4LKMUGS

1    endured the entirety of his incarceration.  He hasn't had a

2    minute of incarceration that was an ordinary incarceration.

3           And he didn't mention today, but I know that he's a

4    vegetarian.  So he asked for vegetarian foods because he knows

5    that the food can be crap in the prison system and because he

6    wanted to keep his weight down, because, as you read, he

7    suffers from gynecomastia, and without the testosterone, that

8    was going to evolve again.  Can you imagine what that would be

9    like to develop breasts when you're incarcerated?  How

10   horrifying would that be?

11          So he's a vegetarian.  So during the course of these

12   lockdowns, the inmates that usually would work in the kitchen

13   were locked down, they weren't cooking.  So he was getting

14   sandwiches, cold peanut butter sandwiches, and apple slices.

15   That's what he subsisted on for an extended period of time.

16   Humans don't live like this.

17          And right now, before Judge Brody, in the Eastern

18   District, I know Federal Defenders have filed a suit against

19   the MDC for the inhumane treatment of their inmates there.  So

20   I know I said I'd be brief, and I guess I lied, but I'm really

21   passionate about this because he is extremely remorseful.  Not

22   all offenders that commit fraudulent offenses are sincerely

23   remorseful, but he is clearly beating himself up about this.

24   And we know he's going to be different going forward.  In part,

25   because of the harsh conditions, but he's had so much time to

M4LKMUGS

1    think about this.

2            His attorney and I have received hundreds and hundreds

3    of emails from him talking about these factors.  I guess I

4    would like the Court to consider all these factors when

5    imposing sentence today.

6            THE COURT:  I think I gave a recitation pretty

7    detailed at the outset.  One reason I did that, and do that, is

8    to show that I have, in fact, taken all of these factors into

9    consideration, including the harsh treatment of prisoners.  So

10   I get it.

11           MS. LOCKWOOD:  Thank you.

12           THE COURT:  I totally get it.

13           MS. LOCKWOOD:  Thank you.

14           THE COURT:  Government counsel?

15           MR. RAVI:  Thank you, your Honor.

16           I just want to note --

17           THE COURT:  Excuse me for a minute.  Has he had any

18   mental health treatment?  Was anything offered in the prison?

19   Any services?  I know there's a psychologist over there, but

20   apart from that, are there any mental health programs or --

21   there are in some facilities.

22           MS. LOCKWOOD:  I'd like to speak to that.  They do

23   offer it under normal circumstances.  But as we've been saying,

24   these are not normal circumstances.  Because of the lockdowns,

25   programming has been extremely limited.  The fact that he's

M4LKMUGS

1    able to attend classes with Columbia is miraculous.  Most of my

2    clients at MDC have not only been able to participate in any

3    programming at all whatsoever during these lockdowns, but it's

4    been very difficult to obtain the services of medical

5    professionals and from the mental health treatment

6    professionals there.

7         My understanding is that the psychologist will walk

8    through the unit periodically, and you might be able to grab

9    them then, and Mr. Ma can speak to this, but I don't believe

10   he's been in any real sessions of any kind at the MDC.

11        You want to say something about that?

12        THE DEFENDANT:  Thank you, Ms. Lockwood.

13        No, no programs so far.

14        THE COURT:  Got it.  Okay.

15        Counsel for the government?

16        MR. RAVI:  Your Honor, I want to first kind of address

17   the survey, I think, that defense counsel indicated he had done

18   of other PPP fraud cases.  I'm not sure about the kind of --

19   how meticulous that survey was or how it was done.  I think, as

20   your Honor knows, Mr. Ma was one of the first defendants

21   arrested in connection with COVID loan fraud and, therefore, is

22   one of the first defendants to be sentenced, and there are

23   several more to come.  I think we're just getting started in

24   terms of sentencing COVID loan defendants here in the country,

25   and several more are getting charged every day.

M4LKMUGS

1          That said, the only way I was able to do searches was

2     to Google press releases and Google articles regarding other

3     COVID loan cases.  Based on just simple Google searching, I was

4     able to find at least one other case that a defendant pled

5     guilty to both bank fraud and aggravated identity theft.  This

6     was an Oregon case involving a defendant named David Unitan,

7     U-n-i-t-a-n.  That defendant submitted six EIDL applications

8     that ultimately received funding of $295,000, and that

9     defendant was sentenced to 61 months in prison in Oregon.

10         I also note that defense counsel also indicated that

11    not a single other PPP loan fraud defendant had withdrew their

12    loans.  I personally have charged three PPP loan cases, and

13    another one of those, a defendant, had also withdrawn their

14    loans once they had realized they were under investigation and,

15    therefore, did not receive any funds.  So just in my subset of

16    three, I know of one, and so I'm not sure how complete the

17    survey that was done by defense counsel was, but I just wanted

18    to bring those points to your attention.

19         With respect to the unwarranted sentencing disparity

20    argument — again, it's true — none of the cases cited by

21    defense counsel are in this district, they're not in New York,

22    and I certainly can provide the Court with several cases where

23    defendants have gone in more than 24 months, and I have three

24    examples here that I can proffer to the Court, if you'd like to

25    hear.  One was a Texas man that was sentenced in, I believe it

M4LKMUGS

1    was, the Southern District of Texas.  He was sentenced to

2    110 months for obtaining PPP loans, totaling approximately

3    $1.6 million.

4              THE COURT:  110 months?

5              MR. RAVI:  110.

6              That was in the Southern District of Texas.

7              In the Middle District of North Carolina, there were

8    three defendants that were charged as part of a scheme to

9    obtain $2.7 million in loan proceeds.  One defendant received

10   72 months, another defendant received 60 months, and the third

11   defendant received 66 months in prison.

12             In the Eastern District of Pennsylvania, a

13   Philadelphia man was sentenced to six and a half years for

14   stealing approximately $1 million in PPP loan funds.  I'll just

15   note all these amounts are less than a single application that

16   Mr. Ma submitted to try to get several millions of dollars in

17   loans.

18             So, again, the government did provide your Honor with

19   the JSON tool data from the last five years about defendants

20   who were convicted of offenses under the exact same guideline

21   as Mr. Ma, and also convicted of aggravated identity theft, and

22   I think your Honor has the average sentences were approximately

23   66 months in prison.  In any event, these are all various

24   numbers and data points, but I think the government believes

25   that the proposed sentence of 66 months would be in line, and

M4LKMUGS

1  would not be inconsistent, with sentences in other cases based

2  on the data we have.

3           I also want to just correct one point that defense

4  counsel made that this is not a restitution case.  Generally,

5  that's correct.  I want to note for your Honor that Mr. Ma did,

6  in fact, receive $20,000 in two loan advances pursuant to the

7  EIDL program.  In advance of sentencing, defense counsel sought

8  to work to pay that back through Mr. Ma, and I believe that was

9  financed through his parents.  That was, in fact, paid back.

10 So there was some restitution in this case.  And even assuming

11 defense counsel's argument about the guidelines and how there

12 should be no loss, there was at least a loss of approximately

13 20,000 even under defense counsel's theory, and that guidelines

14 range is not zero to six months, it is, in fact, eight to

15 fourteen months, if you factor in a guideline range of over

16 fifteen months.  So I just wanted to make that point.

17          Your Honor, a lot was said about the aggravated

18 identity theft count here.  As your Honor knows, Mr. Ma was

19 charged with not only a single count of aggravated identity

20 theft, but it was three counts, and he pled guilty --

21          THE COURT:  Just one slight correction:  I don't think

22 a lot was said about aggravated identity theft, so I appreciate

23 your speaking to that issue.

24          MR. RAVI:  Well, your Honor, I think defense counsel's

25 argument is that Mr. Ma should get two years for the aggravated

M4LKMUGS

1    identity theft and should get no time whatsoever for the

2    underlying bank fraud.  But, also, in defense counsel's

3    submission, at page 13, he writes:  In addition, while Mr. Ma

4    is technically guilty of aggravated identity theft, based upon

5    Second Circuit precedent, his use of an already existing

6    corporate email in the name of his former girlfriend for

7    purposes of communications regarding applications is far afield

8    from the intended purpose of the statute.

9            The government strongly disagrees with that statement.

10   The government provided your Honor, at Exhibit L, examples of

11   some of the emails that Mr. Ma sent in the name of his wife, in

12   the name of his former girlfriend.  Use of someone else's

13   identity to commit fraud is exactly what that statute is

14   intended to cover, and I think that is demonstrated by an email

15   that the government actually received from the former

16   girlfriend that was the subject of the aggravated identity

17   theft that Mr. Ma pled guilty to.  And after she was

18   interviewed by Special Agent McKeen about whether or not she

19   sent those emails, she wrote an email after that interview, the

20   following:  Thank you for the email and talk today.  I am truly

21   devastated and heartbroken that he — Mr. Ma — wanted to take a

22   COVID-19 loan and using my personal data.  I don't know what

23   else he uses that for.  I think I was nice to him in the past

24   and that I should not trust people who claim help, take care

25   and be your friend, especially in a country that I'm not a

M4LKMUGS

1    resident of, because you never know what they can do with your

2    personal data, and that's a really good example here.

3            And I think this victim actually broke down, during

4    the interview, when she realized that Mr. Ma had used her

5    identity to commit fraud.  And that's exactly, I think, why

6    Congress imposed such a significant punishment on using someone

7    else's identity to commit fraud, because not only is it the

8    actual crime using their identity, but the effect it has on an

9    individual who knows that their name is being used without

10   their permission to do things and to do bad things.  And I

11   think that is reflective of this victim's statement, but, also,

12   why the aggravated identity theft count here is important.

13           It's also true that not every PPP loan fraudster

14   commits aggravated identity theft.  Mr. Ma used these other

15   identities, but several other defendants have not been charged

16   with that, and not every defendant uses three identities in

17   committing fraud.  So I just want to make that point.

18           Your Honor, defense counsel also spoke about Mr. Ma's

19   withdrawal of the loan applications.  I think the record is

20   clear that this was not some change of heart that the defendant

21   had where he decided to just give back the money.  He clearly,

22   as evidenced by his Google searches about loan fraud, about

23   getting a defense counsel regarding loan fraud, about all these

24   other searches he continued to do, that he clearly believed

25   that he was going to get caught, and he wanted to take

M4LKMUGS

1    mitigation towards that.  And that is relevant consideration

2    for your Honor in determining the conduct here.

3           Separately, it's also important for your Honor to

4    consider the PPE conduct that is reflected in the PSR.  After

5    Mr. Ma withdrew his loan applications, he continued to have him

6    and others make false representations that his company, NYIC,

7    was representing Governor Cuomo and New York State in trying to

8    procure PPE equipment.  Your Honor likely recalls --

9           THE COURT:  I think I mentioned that.

10          MR. RAVI:  You did.

11          And your Honor likely recalls, in May of 2020, how

12   difficult it was to get PPE equipment to those who needed it,

13   how important it was at that time for governments and agencies

14   and hospitals to get this equipment.  And, here, we have

15   Mr. Ma, who continued, even after he withdrew his loan

16   applications, continued to make false representations in what

17   intends to be a scheme to get this PPE equipment without paying

18   for it in advance by representing he was a registered vendor

19   with New York State.

20          So I think that, again, goes to Mr. Ma's mindset

21   during that entire time, and it's consistent with his statement

22   that I quoted at the beginning of our sentencing submission,

23   that he was out there to get money, and to take advantage of

24   this pandemic.  This was not a defendant who needed to do that.

25   He was living in a 1-1/2 million dollar condo.  He clearly was

M4LKMUGS

1    getting financing and wealth from his parents.  He has an

2    incredible network of friends and family support.  The only

3    explanation for what he did was greed.  That's it, plain and

4    simple.  And that is also an important distinction from many

5    other fraud defendants, who oftentimes are in dire straits, who

6    are trying to get money to feed their family, who don't have

7    the financial network and the support that someone like Mr. Ma

8    had.

9         Your Honor, my final point is the importance of

10   general deterrence here in particular.  I think the mitigation

11   specialist spoke about how fraud sentences are very lenient in,

12   apparently, the Eastern District of New York, but that's part

13   of the problem.  A significant sentence here, particularly at

14   this stage where sentencings are still happening here in the

15   Southern District of New York, Eastern District of New York,

16   and will continue to happen for years ahead — I believe this is

17   one of the first sentencings regarding PPP fraud in this

18   district — and it's important to send a message that this type

19   of fraud, during the extremely difficult circumstances facing

20   the country during the pandemic, and which is still facing the

21   country, should, and deserves, a significant sentence.

22        For all those reasons, the government does believe a

23   66-month sentence is appropriate, and that does take into

24   account the fact that Mr. Ma, unlike other defendants, did not

25   receive and spend the money that he sought to get, but, still,

M4LKMUGS

1    a significant sentence is necessary.

2                THE COURT:  Okay.

3                I think we went over asking the parties if they had

4    any further objections to the presentence report.  I think

5    defense counsel said nothing beyond what has been submitted.

6                MR. KATZ:  Correct.

7                THE COURT:  I think Mr. Ma said the same thing, and I

8    think the government did.  So if that's the case, I will now

9    preview the sentence, I'll give you an opportunity to comment

10   on the preview, and then impose the sentence.

11               So I think you've had a very full discussion here, and

12   the submissions have been excellent and thorough.  I've read

13   them all, and I think it's now time to move to the next phase,

14   which is sentencing.

15               My intention is to impose a below-guideline sentence,

16   so to speak, of 52 months combined; that is to say, 26 months

17   on Count Two, which is the fraud, so to speak, and 24 months,

18   which is mandatory consecutive, for the identity theft -- I

19   mean 28 and 24.  My math is wrong.  The total is 52 months;

20   28 months on Count Two and 24 months on Count Eight, for a

21   total of 52 months of incarceration.

22               The guideline range for Count Two is 51 to 63 months,

23   and that's followed by 24 months consecutive on Count Eight.

24               The offense level here was 24 and a Criminal History

25   Category I.

M4LKMUGS

1          And then I intend to impose a term of supervised

2     release following incarceration of five years, and that would

3     be subject to what are called mandatory standard and special

4     conditions.  The mandatory conditions are that defendant not

5     commit another federal, state, or local crime; that he not

6     illegally possess a controlled substance; and that he refrain

7     from any unlawful use of a controlled substance.

8          He will be required to submit to one drug test within

9     15 days of placement on supervision, supervised release, and at

10    least two unscheduled drug tests thereafter, as may be directed

11    by the probation officer.

12         In addition, he is required to comply with what are

13    called standard conditions 1 through 12.  Those are found on

14    pages 34 and 35 of the presentence report, and they include,

15    among other things, that Mr. Ma may not own, possess, or have

16    access to a firearm, ammunition, destructive device, or

17    dangerous weapon.

18         And then plus the following special conditions, which

19    I feel strongly about, and these special conditions are

20    reasonably related to the factors set forth in Section 18,

21    U.S.C., Section 3553(a)(1), (a)(2)(B), (a)(2)(C), and

22    (a)(2)(D), and which the Court also finds involve no greater

23    deprivation of liberty than is reasonably necessary for the

24    purposes set forth in Section 18, U.S.C., 3553(a)(2)(B),

25    (a)(2)(C), and (a)(2)(D), and are consistent with any pertinent

M4LKMUGS

1    policy statements issued by the U.S. Sentencing Commission.

2         These include that Mr. Ma shall be supervised in his

3    district of residence; he will be required to report to

4    probation within 48 hours of release from custody.

5         The next condition is throughout the term of

6    supervised release, he shall participate in weekly individual

7    therapeutic counseling by a licensed therapist and also weekly

8    one group session conducted by a licensed therapist for group

9    therapy.  He may be required to contribute to the cost of

10   services rendered as by a copayment in an amount to be

11   determined by the probation officer based on such factors as

12   availability of third-party payment.

13        In addition -- are there any immigration consequences

14   for someone who's a permanent resident?

15        MR. KATZ:  There very well may be, your Honor.

16        THE COURT:  Ah, okay.

17        Then there is an additional special condition that

18   Mr. Ma shall cooperate with the Department of Homeland

19   Security, Bureau of Citizenship and Immigration Services, in

20   connection with any proceedings that they may bring to

21   determine his status in the U.S., and he's required to abide by

22   their rules, regulations, and laws.

23        I'm not imposing a fine.  None is recommended by

24   probation.

25        Nor do I intend to impose any restitution.  There does

M4LKMUGS

1    not seem to be a victim in the context of 18, U.S.C.,

2    Section 3663 or 3663(a).

3          I am intending to impose a $200 special assessment,

4    which is mandatory under 18, U.S.C., Section 3013.

5          Briefly, the reasons for the sentence are that --

6    well, first of all, the offense level is 24, the criminal

7    history category is I, the guideline range is 51 to 63 months

8    on Count Two and 24 months consecutive on Count Eight, so this

9    sentence is below the guideline range.  I, nevertheless,

10   believe that this sentence is appropriate given, in particular,

11   the seriousness of the offense.  Both the fraud and the

12   identity theft are, in my opinion, quite serious, and the need,

13   therefore, for punishment and deterrence.  By deterrence, I

14   agree with the assistant, particularly general deterrence.

15   These are programs designed to help people who need it, and

16   it's important that we tell people that if they fraudulently

17   submit applications for loans, that they will be punished.

18         I have considered, also, the nature and the

19   circumstances of the offense and the fact that Mr. Ma expressed

20   his remorse early and quickly, and his shame as well — I hope

21   he gets beyond that, is able to in his personal life — as well

22   as the history and characteristics of Mr. Ma.  And there, I

23   think, the need for the therapeutic counseling comes in; I

24   think there is a strong need for it both on an individual and

25   group basis, and if, for no other reason, although I think

M4LKMUGS

1    there is other reason, for the difficult time he and others

2    have while incarcerated here in the New York City prisons, both

3    MCC and MDC.

4            I think this sentence reflects the seriousness of the

5    offense, promotes respect for the law, provides a just

6    punishment, affords adequate deterrence, particularly — I

7    underscore again — general deterrence.  I think it protects the

8    public from further crimes and endeavors to provide Mr. Ma with

9    needed particularly medical — I'm talking about mental health —

10   and correctional treatment in the most effective manner.

11           So if defense counsel wishes to comment or Mr. Ma or

12   the government, they certainly may, and then I'll impose the

13   sentence.

14           MR. KATZ:  Thank you, your Honor.

15           No comment.  Obviously, we've made our position clear.

16   We respectfully disagree with your Honor, but you are the

17   Judge, and you get to make that decision.

18           There are just two points I would like to raise.

19   Pursuant to the plea agreement, I'd ask that the remaining

20   counts be dismissed pursuant to that agreement.

21           I also ask for your Honor's recommendation that Mr. Ma

22   be permitted to serve his sentence at the camp at Otisville,

23   which will allow his family to come visit him.  They reside in

24   the New York City area.

25           THE COURT:  I'll make that recommendation, absolutely.

M4LKMUGS

1          MR. KATZ:  Thank you.

2          THE COURT:  Mr. Ma, anything further you wanted to

3     say?

4          THE DEFENDANT:  I want to appreciate your Honor's

5     advice again, your Honor, and I will keep everything in my

6     mind, and I will do, accordingly, precisely.  I will never let

7     you down.  Thank you, your Honor.

8          THE COURT:  Thank you.

9          How about the government?

10          MR. RAVI:  No, your Honor.  I'll just -- in response

11     to defense counsel, I would do this typically at the end, but I

12     will --

13          THE COURT:  Yes, that's when I will solicit that

14     application.

15          MR. RAVI:  Okay.

16          THE COURT:  Then if Mr. Ma would stand.

17          The guideline range is 51 to 63 months.  That's on

18     Count Two, the fraud count, and that's followed by 24 months

19     consecutive for the identity theft on Count Eight.

20          Having considered the Sentencing Reform Act of 1984,

21     plus the United States Sentencing Guidelines, and most

22     especially the factors at 18, United States Code, Section

23     3553(a), it is my judgment that Mr. Muge Ma be committed to the

24     custody of the Bureau of Prisons to be imprisoned for a term of

25     52 months with credit for the time he's already served.

M4LKMUGS

1      I will make a recommendation that he serve at the camp

2  at Otisville.

3      That's followed by five years of supervised release,

4  subject to the mandatory, the standard, and the special

5  conditions that I outlined and incorporate here by reference.

6      No fine, although -- hold on, maybe I should mention

7  the special conditions again -- that he be supervised in his

8  district of residence; that he report to probation within 48

9  hours; the weekly individual and group therapeutic counseling;

10  and cooperation with the Department of Homeland Security.

11      No fine.

12      No restitution, as we have discussed.

13      A $200 special assessment.

14      I believe that this sentence is squarely supported by

15  the factors at 18, U.S.C., Section 3553(a).

16      Does either counsel know of any legal reason why this

17  sentence should not be imposed as so stated?

18      Starting with the government?

19      MR. RAVI:  Your Honor, on the term of supervised

20  release, I just want to clarify:  I think your Honor is

21  intending to impose a term of five years' supervised release on

22  Count Two with a concurrent term of one year on Count Eight?

23      THE COURT:  Is that -- I hadn't thought that through,

24  but I mean five altogether.  So five is the substantive -- in

25  my opinion, the most substantive count, and five years is on

M4LKMUGS

1    Count Two, one year on identity theft, to run concurrent, yes.

2            MR. KATZ:  That's the statutory maximum on the

3    aggravated identity theft.

4            MS. LOCKWOOD:  Right.

5            THE COURT:  Did you want to add anything?  Any reason

6    why this sentence should not be imposed as so stated?

7            MR. KATZ:  With that correction, no, your Honor.

8            THE COURT:  All right.

9            There is one other thing we have to go over.

10            I hereby order that the sentence be imposed as so

11   stated.

12            Now, Mr. Ma, we have to talk about the waivers of

13   rights that are contained in the plea agreement, and, here, I

14   would say, to the extent that you have not already waived your

15   appeal rights pursuant to the plea agreement, dated May 25,

16   2021, I notify you that -- well, let me tell you what you have

17   waived in the plea agreement.

18            In the plea agreement, you agreed not to file a direct

19   appeal or to bring a collateral challenge, including, but not

20   limited to, an application under 28, United States Code,

21   Sections 2255 and 2241, of any sentence that's within or below

22   the stipulated guideline range of 75 to 87 months of

23   imprisonment.  And, of course, this sentence is substantially

24   below that guideline range, so these waivers of appeal do

25   apply.

M4LKMUGS

1          You also agreed not to challenge your conviction or

2     sentence on direct appeal or through these same habeas

3     challenges under 28, United States Code, Sections 2255 or 2241,

4     on the basis of any actual or perceived adverse immigration

5     consequences, including removal or –– well, removal — I don't

6     think denaturalization applies, but if it does — it's removal

7     or denaturalization, resulting from your guilty plea and

8     conviction.

9          So those are the rights that you've waived.  To the

10    extent that there's any remaining appeal rights that I'm not

11    aware of, I'm notifying you, in any event, to consult with

12    counsel, and that you would have the right to appeal such

13    rights, and if you were unable to pay the cost of an appeal,

14    you would have the right to apply for leave to appeal

15    in forma pauperis.  And if you request, the Clerk of Court

16    would prepare and file a notice of appeal on your behalf

17    immediately.

18         Do you understand the waivers that you agreed to in

19    the plea agreement?

20              THE DEFENDANT:  Yes, I do, your Honor.

21              THE COURT:  Okay.

22         And now I'll ask the government if there are any open

23    counts or counts that you want me to dismiss at this time?

24              MR. RAVI:  Yes, your Honor.  The government moves to

25    dismiss all open counts.

M4LKMUGS

1            THE COURT:  The application is granted.

2            And the last question, starting with defense counsel:

3    Did you wish to add anything to today's sentencing proceeding?

4            MR. KATZ:  No, your Honor.  Thank you.

5            THE COURT:  How about the government?

6            MR. RAVI:  No.  Thank you, your Honor.

7            THE COURT:  All right.  I think that concludes our

8    work for today.

9            Mr. Ma, I wish you the very best of luck going

10   forward.  Thanks very much.

11           THE DEFENDANT:  Thank you.

12           THE COURT:  We're adjourned.

13           THE DEFENDANT:  Thank you, your Honor.

14           THE COURT:  Yes.

15                              *  *  *

16

17

18

19

20

21

22

23

24

25